Lawrence E. BIESKI, Jesse Colpo and Edward W. Keefer, individually and as representatives of a Class

v.

EASTERN AUTOMOBILE FORWARDING COMPANY, Inc., M & G Convoy, Inc., and Highway Truck Drivers and Helpers, Local 107, an unincorporated association affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

**Civ. A. No. 2797.**

United States District Court
D. Delaware.
July 16, 1964.

Kenneth W. Lewis of Daley & Lewis, Wilmington, Del., and Edward B. Bergman of Solo, Bergman & Trommer, Philadelphia, Pa., for plaintiffs.

Joseph T. Walsh, Wilmington, Del., George S. Dixon and Robert Alan Parr of Matheson, Dixon & Bieneman, Detroit, Mich., for defendants, Eastern Automobile Forwarding Co., Inc. and M & G Convoy, Inc.

O. Francis Biondi of Errigo, Biondi & Porter, Wilmington, Del., and Richard H. Markowitz of Wilderman, Markowitz & Kirschner, Philadelphia, Pa., for defendant, Highway Truck Drivers and Helpers, Local 107.

CALEB M. WRIGHT, Chief Judge.

This matter is before the court on plaintiffs' motion for a preliminary injunction.[1]

Plaintiffs are three individuals, formerly truck drivers employed by Eastern Automobile Forwarding Company, Inc. (Eastern).[2] They bring this action for themselves and in behalf of fifty-two individuals, similarly situated, all former drivers of Eastern.[3] The complaint alleges that they are members of defendant Highway Truck Drivers and Helpers, Local 107, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

Eastern was a common carrier engaged in the transportation of automobiles.[4] It hauled automobiles out of the Chrysler assembly plant at Newark, Delaware, to points in New Jersey and New York.[5] Defendant M & G Convoy, Inc. (M & G) is also a common carrier of automobiles, hauling automobiles for Chrysler prior to January 15, 1964, to eastern Pennsylvania, parts of New England, and parts of eastern New York, including Westchester County and Brooklyn.[6] Both Eastern and M & G had Interstate Commerce Commission operating rights covering the same geographical area,[7] but they were not competitors since Chrysler allocated territory to each and each handled delivery of automobiles in its allocated area only.[8] Because of the increased competition of the railroads, Eastern found it was not getting enough Chrysler business to operate at a profit.[9] Wolverton, the president and owner of Eastern, sought additional traffic from Chrysler, but was informed nothing could be done and that as railheads were established by the Pennsylvania Railroad, Eastern's business would be decreased.[10] This information was furnished Wolverton by the traffic manager of Chrysler at a meeting in Detroit in December of 1963.[11] Wolverton then discussed with M & G the possibility of selling out to it,[12] and shortly thereafter Wolverton and Mr. Hand of M & G met in Detroit with the traffic manager of Chrysler. Wolverton informed Chrysler he had made an agreement to sell out to M & G and was assured that Chrysler "would go along" with Eastern and deliver cars to them until the sale to M & G became effective.[13] The agreement provided for the purchase of Eastern's real estate and substantially all of its operating equipment, but not any I.C.C. operating certificates, licenses, good will, accounts receivable, or cash.[14] As of January 15, 1964, all cars formerly transported by Eastern were handled by M & G [15] and Eastern ceased the employment of all its drivers as of that date.

All of the defendants were parties to a multi-employer, multi-union and multi-plant collective bargaining agreement, re-

1. A complaint was filed on January 31, 1964. The court denied a motion for a temporary restraining order on February 3, 1964. On March 11, 1964 a hearing was held on plaintiffs' motion for preliminary injunction and extensive testimony was taken. The matter has been thoroughly briefed and argued. Letters of the attorneys for the union and plaintiffs, dated May 28, 1964 and May 29, 1964, respectively, addressed to matters raised at the argument, were received by the court on or about June 1, 1964.

2. Complaint, ¶ 1.

3. Complaint, ¶ 1.

4. PX 4, Wolverton Deposition, pp. 2, 3.

5. Id. at p. 4.

6. N.T. 136.

7. PX 4, Wolverton Deposition, p. 26.

8. Id. at p. 4.

9. Id. at p. 7.

10. Ibid.

11. Id. at p. 8.

12. Id. at pp. 13, 14.

13. PX 4, Wolverton Deposition, p. 15.

14. Affidavit of Edward J. Hand, and Exhibit A attached (copy of sales agreement).

15. N.T. 137.

ferred to as the Eastern Conference Area Truckaway and Driveaway Agreement (Agreement).[16] All of the drivers for both Eastern and M & G were represented by Local 107. The collective bargaining agreement insofar as the provisions pertinent to this case are concerned is similar to the collective bargaining agreement construed in the recent case of Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). Article 4, Section 1, provides, "Terminal seniority will be maintained * * *." Section 3 of the same Article provides that any controversy over seniority standing shall be submitted to the grievance procedure. Section 4 provides that "in the event an entire operation, or any part thereof is sold, leased, transferred or taken over by sale, transfer, lease assignment, receivership, or bankruptcy proceeding, such operation shall continue to be subject to the terms and conditions of this Agreement * * *." Section 5 of the same Article is as follows:

> "In the event that the Employer absorbs the business of another private, contract or common carrier, or is a party to a merger of lines, the seniority of the employees absorbed or affected thereby shall be determined by mutual agreement between the Employer and the Unions involved. Any controversy with respect to such matter shall be submitted to the grievance procedure (Article 6)."

Article 6 provides that the grievance shall be taken up by the shop steward and if no settlement is reached, then by the business agent for the local union involved and the company representative. If no settlement can be reached at this level, then the Eastern Conference Automobile Transporters Joint Committee (Committee or Joint Committee), established to settle disputes and grievances which cannot be settled at the local level, shall hear the evidence and witnesses in support of the respective positions of the disputants and shall investigate all facts pertaining to the dispute. It is provided that the decision of a majority of the Joint Committee is final and binding upon the parties involved; and in the event of noncompliance with the decision of the Joint Committee by one of the parties to the dispute, the other party has the immediate right to all legal and economic recourse.

In the event of a deadlock by the Joint Committee, it is provided that the grievance be submitted to an impartial arbitrator who "shall have the authority to interpret and apply the provisions of this Agreement, but shall not have the authority to amend or modify this Agreement or establish new terms and conditions under this Agreement."

Section 6 of Article 6 (Grievance Machinery) reads as follows:

> "Unless otherwise expressly provided in this Agreement, any and all disputes, including interpretations of contract provisions, arising under, out of, in connection with, or in relation to this collective bargaining agreement shall be subject to the grievance procedure of this Agreement."

On January 8, 1964, Mr. Forrest Wolverton, president of Eastern, addressed the Eastern employees and advised them that he was going out of business and that they should seek other employment.[17] On that date a meeting was held in the Union office with the Union representatives and M & G officials; the stewards from Eastern and M & G also being present.[18] It was apparent that the question of employment by M & G of Eastern drivers could not be compromised at the local level. The purpose of the meeting was to resolve the seniority problem pending a hearing before the Joint Committee.[19] It was agreed that dovetailing pending the Joint Committee hearing would be proper.

16. PX 1.

17. Affidavit of Frederick F. Reinhardt; N.T. 88.

18. N.T. 169, 170.

19. N.T. 172.

Since Local 107 represented the employees of both Eastern and M & G the Union called a meeting of all Eastern and M & G employees on January 10, 1964.[20] The Union business agent, Craig, explained that the question of seniority would have to go to the Joint Committee [21] and that Mr. Hand of M & G thought they should dovetail until the matter was determined by the Joint Committee.[22] Mr. Craig agreed.[23]

M & G drivers rejected the temporary dovetailing arrangement.[24] Finally, it was agreed that Eastern employees and M & G employees would work on separate seniority lists pending the Joint Committee's decision.[25]

On January 23, 1964, the Joint Committee met in New York City. As provided by the grievance procedure set forth in the collective bargaining contract a panel of the Joint Committee was chosen to hear the dispute. The agreement and the rules of procedure of the Joint Comittee [26] provide that the panel shall consist of an equal number of representatives of the employees and unions who are parties to the contract. It is also provided that co-secretaries of the Joint Committee, one for the union and one for the employees,[27] or their alternates, shall be members of the panel.[28] The plaintiffs and the M & G employees received notice of the Joint Committee hearing. Present at the hearing were the shop stewards for Eastern and M & G

and about 15 or 20 Eastern employees including Colpo, one of the plaintiffs.[29] All of the parties who desired to be heard were given the opportunity to express their views and to make suggestions as to how the matter of seniority should be handled.[30] The business agent for the Union, Mr. Craig, explained the transactions leading up to the grievance and presented the facts as he knew them, but did not take any position with respect to seniority rights under the circumstances of the case.[31] The minutes also disclose there was no objection to the panel and that Mr. Colpo, one of the plaintiffs, was recognized by the chairman and expressed confidence in the panel.[32]

The decision of the Joint Committee panel was as follows:

"The Panel in executive session, by unanimous decision, based on evidence presented, finds there was no Corporate acquisition, purchase, or merger within the meaning of Article 4, Sections 4 and 5, of the Eastern Conference Area Truckaway and Driveaway Agreement, and therefore, M & G Convoy Co., Newark, Delaware, Terminal, has no obligation to recognize the seniority claim of drivers formerly employed by Eastern Auto Forwarding Co., Newark, Delaware, Terminal, or employment, except as outlined under Article 1, Section 2, of the Eastern

---

20. N.T. 172.

21. N.T. 108.

22. N.T. 111.

23. N.T. 112.

24. N.T. 110–112.

25. N.T. 113, 180–182; affidavit of Charles Weed.

26. PX 2.

27. PX 1—Article 6, Sections 2, 3.

28. PX 2—Rules of Procedure (Joint Committee).

29. N.T. 116. Joint Committee meeting minutes of January 23, 1964 (Exhibit A to Craig affidavit).

30. See minutes of Joint Committee meeting of January 23, 1964; N.T. 150 (Weed); N.T 163 (Bonner).

31. See minutes of Joint Committee meeting of January 23, 1964. Although the minutes do not indicate that Craig presented every detail of what transpired, they show that in all essentials the facts presented by Craig were correct and adequate. The panel was not informed that Forrest Wolverton had an employment contract with M & G for 4 years and was joining its Board of Directors (Wolverton Deposition), but there is no evidence Craig knew this or that the Committee did not know it.

32. See minutes of Joint Committee meeting of January 23, 1964.

Conference Area Truckaway and Driveaway Agreement." [33]

This action is brought under the provisions of Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), which provides that suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or citizenship of the parties.

■ The complaint alleges that Eastern, M & G, and Local 107 conspired together to deprive the plaintiffs of their seniority rights under the provisions of the collective bargaining contract by seeking unfairly to influence the decision of the Joint Committee; [34] and further, that the Union breached its duty of fair representation owed to the plaintiffs under the terms of the collective bargaining agreement.[35] The complaint thus charges both the employers and the Union with dishonesty and a breach of duty in procuring the decision of the Joint Committee. For this reason alone plaintiffs state a cause of action arising under § 301 of the Labor Management Relations Act cognizable in this court. See Humphrey v. Moore, supra.

Where within the framework of labor agreements, unions and management have provided by contract for the settlement of disputes, the courts have sought to foster the collective bargaining process by refusing to interfere with decisions reached through the procedure established by the parties.[36] Absent fraud or conspiracy, the courts have pursued a "hands off" policy.

The parties to the collective bargaining agreement here in issue have established by virtue of Section 5 of Article 4 the method of determining seniority and job status of the employees affected when there is an absorption or merger of one company by another. In such event, the union, in behalf of the employees it represents, and the employer have by agreement designated the Joint Committee to determine the status of the affected employees and have agreed to be bound by the decision of the majority of the Joint Committee.

■ Here the Joint Committee found there was no absorption or merger by M & G of Eastern within the meaning of Article 4, Section 5, of the agreement.[37] Therefore, Article 4, Section 5, does not come into play, since Section 5 by its own terms limits the authority of the Committee to disputes over seniority in the event of absorption or merger.[38] The authority of the Joint Committee to determine whether there was an absorption or merger in the first instance is derived from Section 6 of Article 6, which states that "[U]nless otherwise provided in this Agreement, any and all disputes, including interpretations of contract provisions, arising under, out of, in connection with, or in relation to * * *" the collective bargaining agreement shall be subject to the grievance procedure of the agreement. Under the provisions of this section the Committee had authority under the contract to determine whether there was an absorption or merger.[39] Since the Joint Committee held there

33. Id. at p. 6.

34. Complaint, ¶¶ 13, 14. The Joint Committee acts through the panel. Hereafter, when the court refers to actions of the "Committee" or "Joint Committee" it means actions taken by the panel.

35. Id. at ¶ 15.

36. Kahn, "Seniority Problems in Business Mergers", 8 Industrial & Labor Relations Review, pp. 361, 363.

37. While the decision of the Joint Committee states, "there was no corporate

acquisition, purchase, or merger within the meaning of Article 4, Sections 4 and 5," it is obvious the Joint Committee, the Union, and the employers considered the issue to be whether or not there was an absorption or merger within the meaning of Article 4, Section 5.

38. See Humphrey v. Moore, supra, 375 U.S. at 345–346, 84 S.Ct. at 370, note 8.

39. If the Committee had interpreted the collective bargaining agreement so as to determine there was an absorption or merger, it would not necessarily have had

was no absorption or merger and the collective bargaining agreement contained no other provision relative to seniority applicable to the former Eastern employees, the Joint Committee was without authority to afford the defendants any relief.

This court has no power to set aside the decision of the Joint Committee unless it is presented with substantial evidence of fraud, deceitful action or dishonest conduct by the Union and the employer which would vitiate and nullify the decision of the Joint Committee, or unless there is substantial evidence of lack of good faith and honesty of purpose on the part of the Union in the exercise of its duty of fair representation as the collective bargaining agent. In the absence of such infirmities, it is the court's function to sanction the settlement of disputes arrived at in accordance with the collective bargaining process. "Thus, if the award at bar is the parties' chosen instrument for the definitive settlement of grievances under the Agreement, it is enforceable under § 301." General Drivers, Warehousemen & Helpers, etc. v. Riss & Company, Inc., 372 U.S. 517, 519, 83 S.Ct. 789, 791, 9 L.Ed.2d 918 (1963). The court finds no substantial evidence that the Union has breached its duty of fair representation or that the defendants are guilty of fraud, deceitful actions, or dishonest conduct.

First, plaintiffs charge that Eastern, M & G, Local 107, and other teamster representatives conspired to obtain a decision by the Committee adverse to the seniority rights of plaintiffs[40] based upon facts not of record. While it is true that conversations took place among representatives of parties to the dispute without the presence of representatives of the Eastern drivers, there is no indication that a conspiracy was formed to coerce or persuade the Committee unjustly to find no absorption within Article 4, Section 5. For the most part the discussions brought to light were apparently concerned with effecting some temporary solution to the seniority issue until the Committee reached its decision. There is no substantial evidence that the employers and the Union conspired to subvert the function of the Committee outlined in Article 6, Section 4 of the agreement, i. e., to hear the evidence presented by both parties and to investigate all facts pertaining to the dispute.

Second, the plaintiffs charge that Local 107 breached the duty of fair representation owed to plaintiffs.[41] See Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953).

Plaintiffs complain that Local 107 representatives carried on discussions with employers and with members of the Committee without plaintiffs' knowledge and permitted representatives of the employers to influence Union representatives on the Committee. The evidence is insufficient to support these contentions, and, more important, it does not substantiate the charge that the Union acted in a manner inconsistent with its duty to represent the best interests of its members.

Plaintiffs complain that the Union breached its duty of fair representation by taking a neutral position in dealing with the two employers and the Committee, thereby permitting the employers unilaterally to readjust seniority rights.[42] That a Union takes a neutral position as between two groups of employees it represents at the hearing before a Joint Committee is no evidence of unilateral adjustment of seniority rights by the employers. A neutral stand by the Union is not inconsistent with the Union's duty of fair representation.[43] Whether the

---

to order dovetailing or interlocking of the employees of Eastern and M & G. Dovetailing or interlocking is not a sine qua non for reasonable solution of seniority problems upon absorption or merger. The Supreme Court in Humphrey v. Moore, supra, established no such standard.

40. Complaint, ¶ 14.

41. Complaint, ¶ 15.

42. Complaint, ¶ 15(a).

43. Aaron, "Reflections on the Legal Nature and Enforceability of Seniority Rights", 75 Harv.L.Rev. 1532, 1536. See also Humphrey v. Moore, supra.

Union espouses the cause of one group of employees or remains neutral, its duty is the same. It must honestly and fairly present the facts to the Committee, so that the Committee can arrive at the best solution.

Plaintiffs argue that the fact that no transfer of I.C.C. operating rights was necessary between M & G and Eastern, because their operating rights were co-extensive, was not adequately presented to the Committee. The question is not one of presentation, but whether the Committee was aware of the facts respecting the non-transfer of I.C.C. operating rights. The minutes show that Mr. Hand of M & G informed the Committee he was buying no I.C.C. rights from Eastern and that Eastern had surrendered its rights; that all traffic to Eastern from Chrysler was suspended on January 12, 1964, and traffic formerly given to Eastern by Chrysler was routed to M & G; and, that M & G had no guarantee that it would enjoy the Eastern traffic since Chrysler assigned the work.[44] Certainly it is obvious, that if the Committee was aware Eastern's I.C.C. rights were not purchased by M & G and M & G received Eastern's traffic from Chrysler, it was also aware that I.C.C. rights did not have to be transferred and the rights were co-extensive. The court cannot agree that the facts relating to I.C.C. rights were not adequately or fairly presented to the Committee.[45]

Plaintiffs also maintain that the Joint Committee was wrong in its determination because the teaching of the Hum-phrey v. Moore, supra, decision was not adequately presented to it. While the Committee is not made up of lawyers, it does not appear that its members were unaware of the Humphrey case. Certainly, Carney Matheson, co-chairman of the Committee showed some knowledge of the case because he referred to it.[46] More important, however, this Court cannot subscribe to plaintiffs' view that the decision of the Joint Committee would have necessarily been different had it known of the Humphrey decision. The facts of the two cases are not the same. Nor does the Supreme Court in Humphrey v. Moore establish a rule that there must be dovetail of seniority lists each time companies such as M & G and Eastern are integrated.[47] It was within the power of the Joint Committee to find an absorption and still require the Eastern employees to go to the bottom of the list pursuant to a plan worked out by the Union and employers.[48]

The Union has not breached its duty of fair representation by taking a neutral position or by any other action. There is no evidence that the Union did not endeavor to present the relevant facts to the Committee to aid in its determination. There is no evidence of a conspiracy or of wrongdoing on the part of M & G, Eastern or Local 107. "The decision of the committee, reached after proceedings adequate under the agreement, is final and binding upon the parties, just as the contract says it is." Humphrey v. Moore, supra, 375 U.S. at 351, 84 S.Ct. at 372.

Injunction denied.

---

44. See minutes of Joint Committee meeting dated January 23, 1964; testimony of Hand, Craig and Sockolosky, union steward for M & G drivers at Newark, Del.

45. It is not within the province of this court to determine what, if any, effect the non-transfer of I.C.C. rights may have had upon the decision of the Committee.

The agreement places determination of seniority and jobs in the hands of the Joint Committee. This is the contractual obligation of the parties reached in the process of collective bargaining. The powers granted to the Joint Committee are necessarily broad and all inclusive. The task of determining the rights of individuals to seniority and jobs is a difficult one at best, and is an agonizing one where job opportunities are contracting either because of competition from without or automation within the industry. See Aaron article cited at footnote 43.

46. Colpo affidavit, pp. 3, 4.

47. See footnote 39, supra.

48. See Eastern Conference Area Truckaway & Driveaway Agreement, Article 4, Section 5.