**Lawrence E. BIESKI et al.**

v.

**EASTERN AUTOMOBILE FORWARD-ING COMPANY, Inc., M & G Convoy, Inc., and Highway Truck Drivers and Helpers, Local 107, an Unincorporated Association, Affiliated With the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America**

**Eastern Conference Automobile Transporters Joint Committee**

**and**

**Joseph A. Socklosky, Adam Dorosky and William Greenly, Acting on Their Own Behalf and on Behalf of Approximately Eighty-one Other Drivers Presently Employed by M & G Convoy, Inc., Intervenors**

**Lawrence E. Bieski et al., Appellants.**

**No. 16954.**

United States Court of Appeals Third Circuit.

Argued March 7, 1968.

Decided May 29, 1968.

Rehearing Denied June 27, 1968.

See also 3 Cir., 354 F.2d 414.

Bernard Balick, Aerenson & Balick, Wilmington, Del. (Edward B. Bergman, Solo, Bergman & Trommer, Philadelphia, Pa., on the brief), for appellants.

R. Ian Hunter, Matheson, Dixon & Bieneman, Detroit, Mich. (Joseph T. Walsh, Wilmington, Del., on the brief), for corporate appellees, Eastern Automobile Forwarding Co., Inc. and M & G Convoy, Inc.

Hugh J. Beins, Washington, D. C., for appellee, Eastern Conference Automobile Transporters.

James J. Martin, Philadelphia, Pa. (Alvin M. Chanin, Philadelphia, Pa., on the brief), for Joseph A. Socklosky, and others, intervenors-appellees.

Before HASTIE, Chief Judge, and SEITZ and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This appeal is from an order of the District Court granting the defendants-appellees' motion for summary judgment. The underlying controversy in this case concerns certain seniority rights under a collectively-bargained labor

agreement. There being substantial allegations that the seniority rights, if any, arise from such a contract and that recourse may lie for an alleged breach of the contract, the court has jurisdiction under § 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), authorizing District Court jurisdiction of suits for "violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." Humphrey v. Moore, 375 U.S. 335, 341–444, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Chasis v. Progress Manufacturing Company, 382 F.2d 773 (3rd Cir. 1967).

The 20 appellants, part of 24 plaintiffs below,[1] were formerly employed by Eastern Automobile Forwarding Company, Inc. (Eastern) a trucking company in the business of hauling new automobiles from the Chrysler Corporation assembly plant in Newark, Delaware. In January 1964, Eastern sold certain of its assets to M & G Convoy, Inc. (M & G), a similar company also hauling Chrysler's automobiles from the Delaware plant. The written agreement of sale provided for M & G to buy Eastern's real estate (two terminal properties) and substantially all of its operating equipment (mainly trucks). By the terms of this instrument, nothing else was transferred, neither goodwill, licenses, accounts receivable, liabilities, cash, nor I.C.C. operating certificate. After the sale, Eastern went out of business.

The appellants, Eastern drivers, finding themselves without employment, contend that they should have been hired by M & G on a basis that allowed them to keep their seniority gained while working for Eastern. They base this contention upon a multi-employer, multi-union, and multi-plant collective bargaining agreement: the Eastern Conference Area Truckaway and Driveaway Agreement (Agreement). The sections of this Agreement that possibly are relevant to this dispute concern seniority and grievance machinery. Article IV, "Seniority," provides in Section 1 that "terminal seniority will be maintained in accordance with the terms of this Agreement." Then, after the listing of seniority classifications, rules, and notice requirements, Section 3 concludes: "Any controversy over the seniority standing of any employee on the Seniority List shall be submitted to the Grievance procedure (Article 6)." Section 4, "Sale, Transfer, Etc.", provides that the Agreement would be binding on any successors or assigns of parties signing the Agreement and that any "purchaser, transferee, lessee, assignee, etc." of "an entire operation, or any part thereof," had to receive notice of the existence of the Agreement. Section 5, "Mergers, Etc.", provides:

"In the event that the Employer absorbs the business of another private contract or common carrier or is a party to a merger of lines the seniority of the employees absorbed or affected thereby shall be determined by mutual agreement between the Employer and the Unions involved. Any controversy with respect to such matter shall be submitted to the grievance procedure (Article 6)."

Article 6, the "Grievance Machinery," provides that if "disputes and grievances" could not be settled by shop stewards or between local Union business agents and the company, then the dispute should go before a Joint Committee. This Committee, composed of equal numbers of representatives of unions and employers who were parties to the Agreement, was empowered to hear evidence and investigate the facts of a dispute; a decision by a majority was declared "final and binding on all the parties involved" (Section 3). Section 5 of Article 6 provides for final and binding arbitration if the Joint Committee is deadlocked, and Section 6, "Disputes and Requests

---

1. The suit was originally a class action but was amended prior to the final hearing for a permanent injunction.

for Interpretation," concludes that Article:

> "Unless otherwise expressly provided in this Agreement, any and all disputes, including interpretations of contract provisions, arising under, out, in connection with, or in relation to this collective bargaining agreement shall be subject to the grievance procedure of the Agreement."

■ Of the unions party to this Agreement, Local 107 [2] represented both the Eastern drivers and those at M & G. Consequently, one group of Union members, appellants here, wanted to be hired at M & G without losing all of their seniority by means of some form of "dovetailing;" [3] the other group of members of the same Local, M & G drivers, did not want to be pushed down their own seniority ladder and insisted that any transferring Eastern drivers go to the "bottom of the board." All parties concerned with this dispute seemed to agree at the outset that Article 4, Section 5, of the Agreement controlled and that the best road to decision was appeal to the Joint Committee. In the interim, the two groups of drivers, Local 107's business agent, and M & G agreed on the temporary solution of separate seniority lists for deliveries to the remaining pre-sale Eastern and pre-sale M & G dealers.

In the eyes of all parties, the seniority dispute turned on the application of Article IV to the terms of the business deal between Eastern and M & G.[4] Before the sale, M & G and Eastern (both common carriers with geographically co-extensive I.C.C. operating rights) hauled cars from Delaware, each to its own group of dealers. Eastern hauled to New Jersey and parts of New York; M & G hauled to parts of Pennsylvania, parts of New England, and parts of New York not served by Eastern. This division of territory could not be subject to a written agreement under I.C.C. regulations; it was established and enforced by Chrysler on an oral basis. In 1963, Chrysler informed Eastern and M & G that increased railroad shipping would reduce the business available to the truckers. This prompted Eastern's president and sole shareholder to leave the business and, accordingly, he sought a deal with M & G—one firm, but not two, could profitably survive in the face of the railroad competition. The record reveals that there was a meeting between Chrysler's Traffic Manager and the presidents of both M & G and Eastern. No one attending that meeting has testified or deposed that an explicit oral agreement was reached that when Eastern sold certain of its assets and went out of business, Chrysler would give to M & G the former Eastern customers. The president of Eastern said that Chrysler agreed to deliver cars to Eastern up until the day of the sale and that he "naturally supposed

---

2. Highway Truck Drivers and Helpers, Local 107, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

3. "Dovetailing" is a labor relations term referring to some system of unifying, on one "board," two previously separate seniority lists. An unlimited number of variations are possible when two groups are combined and at least three general types have been mentioned in this case: (1) "Strict dovetailing," in which the senior man at M & G is followed by the senior man at Eastern, then the second man at M & G and so forth; (2) "sandwiching," a ratio concept, where, after Eastern's drivers are compared to M & G's and the ratio determined, the new list might have the senior man at Eastern followed by the first two men at M & G, then the second at Eastern followed by the third and fourth at M & G, and so forth; and (3) "separate boards," not really a type of "dovetailing," in which separate seniority lists are kept for former Eastern routes and dealers and for M & G's routes and dealers.

4. Also, it is noted that the minutes of the Joint Committee meeting of January 23, 1964, state in the first paragraph:
   "The issue involved in this Case is the [sic] Union (Local 107) has requested an interpretation of Article 4, Section 5, of Truckaway Agreement, due to the fact of M & G Convoy Company buying out Eastern Auto Forwarding Company. This will involve a problem of seniority status."

they [M & G] would [get Eastern's former business] if they bought the Company [Eastern]." The District Court properly found that "as of January 15, 1964, all cars formerly transported by Eastern were handled by M & G * * *." 231 F.Supp. 710, at 712.

At the hearing before the Joint Committee, various Eastern and M & G employees apparently [5] attempted to give their opinion of whether the sale of Eastern real estate and operating equipment was nonetheless an "absorption of business" within Article 4, Section 5, of the Agreement. Local 107's business agent apparently took no argumentative position on the absorption question and merely outlined factually the events of the sale and the M & G drivers' refusal to agree to any dovetailing. M & G's president pointed out that M & G did not buy any I.C.C. rights, capital stock, assets, or liabilities from Eastern other than two of three parcels of real estate and 99% of Eastern's tractors and trailers. He "reiterated that he did not buy any I.C.C. rights from Eastern * * *" No one pointed out that the purchase of such I.C.C. rights would have been illegal and, hence, such reiteration had no significance.[6]

A unanimous decision of the Joint Committee followed, ruling that "there was no corporate *acquisition, purchase, or merger* within the meaning of Article 4, *Section 4 and 5*" [emphasis added] of the Agreement, and, therefore, M & G had no duty under the Agreement to recognize the seniority requests of former Eastern drivers. Dissatisfied with this ruling, certain of the present appellants instituted a class action in the District Court, seeking a preliminary injunction to prevent any effect being given to the Joint Committee's decision. They further asked for a court decision under § 301(a) of the L.M.R.A. that "dovetailing" should be required under the contract and that the Eastern employees currently denied such dovetailing were entitled to damages for lost wages. After a lengthy hearing, the District Court denied any preliminary injunction, Bieski v. Eastern Automobile Forwarding Company, 231 F.Supp. 710 (D.Del.1964), and we affirmed his exercise of discretion, expressly refraining from giving any opinion on the merits, 354 F.2d 414 (3rd Cir. 1965). During the pendency of this earlier appeal, Local 107 changed its counsel and, also changing its "neutral" position taken before the Joint Committee, urged us to reverse the District Court.[7]

On the hearing for a permanent injunction, the appellants introduced as additional evidence only an affidavit of the management lawyer who headed the Joint Committee the day of the hearing,[8] and the present appeal is from an order granting the defendants' cross-motion for summary judgment.[9]

---

5. No transcript was kept of the Joint Committee meeting. The record contains summarizing "minutes" of what transpired, plus testimony before the District Court of various people's recollection of what was said and the accuracy of the "minutes."

6. It is noted that the Joint Committee chairman, a lawyer who was competent to point out the insignificance of no transfer of I. C. C. rights, remained silent as far as the minutes show. This lawyer's client, M & G, had a financial interest in a finding of no "absorption" under the terms of Article 4, Section 5; see footnote 15, infra.

7. Local 107's change of position prompted the reargument held on the first appeal.

8. This affidavit, held irrelevant to the decision by the District Court, showed that the Committee co-chairman presiding at the hearing, Carney D. Matheson, was also a lawyer for both Eastern and M & G. The Joint Committee Rules show that his presiding was according to Rule 4, which provided that the Union and employer co-chairmen would alternate as Acting Chairman at each meeting. The affidavit also showed that Mr. Matheson also presided over the Joint Committee whose decision was later challenged unsuccessfully in Humphrey v. Moore, supra.

9. After our affirmance of the denial of a preliminary injunction, the District Court allowed representatives of the M & G em-

The precise question presented on the "merits" of this action is whether the Federal Courts can reverse the decision of a Joint Committee which has acted pursuant to a labor agreement, one section of which declared that the Joint Committee's decision would be "final and binding." On this record and in light of the recent Supreme Court decision in Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), we affirm the conclusion of the District Court that the appellants failed to show a breach of the duty of fair representation sufficient to allow the courts to interfere on that basis with the agreed-upon private determination of a labor dispute. Such a conclusion, however, does not dispose of the matter.

The Supreme Court decision in Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363 (1964), dealt with a dispute closely analogous to the one at bar. In that case, the Joint Committee had determined a seniority "sandwiching" under a labor agreement almost identical to the Agreement in the present case. The Kentucky Court of Appeals, reversing the state court's denial of an injunction, granted a permanent injunction against giving any effect to the Joint Committee's decision and the Supreme Court reversed, holding that the dissatisfied employees seeking the restraint of the Joint Committee decision had not proved their case:

> "The decision of the committee, reached after proceedings adequate under the agreement, is final and binding upon the parties, just as the contract says it is. General Drivers, etc., Union v. Riss & Co., 372 U.S. 517, 83 S.Ct.

789, 9 L.Ed.2d 918." 375 U.S. at 351, 84 S.Ct. at 372.

Humphrey v. Moore, therefore, presents the obverse situation to the case at bar. But the approach of the Supreme Court in reversing the Kentucky court offers guidelines for our decision.

## I.

■ Under present Supreme Court decisions, the prominent labor policy of encouraging private settlement of disputes militates against court review of such private decisions except in the narrowest of circumstances.[10] The appellants argue that the present case falls outside the general rule of these cases prohibiting court review absent fraud and deceit. (This was the standard used by the District Court. 231 F.Supp. at 716.) The "fraud and deceit" standard, they argue, is proper only in "arbitration" cases. As authority they cite Humphrey v. Moore, 375 U.S. at 345–348, 84 S.Ct. 363, where the Joint Committee's decision was found "reasonably concluded" and "neither unique nor arbitrary." Appellants also point out that the "arbitration" cases [11] were not cited in Humphrey v. Moore and argue that the omission is significant.

■ We do not think that such a conceptual distinction between court review of arbitration and committee decisions is necessarily appropriate under federal labor law. Rather, with the specific labor agreement as a necessary starting point, the question of judicial review of a "final" private decision should turn on the adequacy of that private decision under the contract in terms of the con-

---

ployees and the Joint Committee to intervene as parties defendant. The District Court, in granting summary judgment for the defendants-appellees, decreed "it appropriate to do no more than reaffirm its opinion of July 16, 1964, as reported at 231 F.Supp. 710, adopting the facts and conclusions of that opinion, and incorporating them by reference herein."

10. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 567, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United

Steelworkers of America, etc. v. Warrior & Gulf Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 424 (1960); General Drivers, etc., Union v. Riss & Co., 372 U.S. 517, 519, 83 S.Ct. 789, 9 L.Ed. 2d 918 (1963); Republic Steel Corp. v. Maddox, 379 U.S. 650, 653, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).

11. See the *Steelworkers* "trilogy," ibid.

38

troversy presented.[12] If the court is convinced both that the contract procedure was intended to cover the dispute and, in addition, that the intended procedure was adequate to provide a fair and informed decision, then review of the merits of any decision should be limited to cases of fraud, deceit, or instances of unions in breach of their duty of fair representation.

If, however, the private decision complained of is a "jurisdictional" one—that a certain dispute will not be considered on its merits by the private decision-maker—then the court is a proper forum to review this decision on the basis of its analysis of the contract entered into by the parties. John Wiley & Sons v. Livingston, 376 U.S. 543, 546–547, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). This is particularly true where the court is convinced that a private procedure used for the determination is not adequate to decide fairly and fully such an important initial question. Rothlein v. Armour & Company, Inc., supra.

## II.

Turning thus to the Agreement, the central question is what provisions govern this seniority dispute. The Supreme Court in Humphrey v. Moore raised this precise problem of the contractual authority for the Joint Committee's decision, but never decided the dispute over this issue since, in their view, regardless of the section applicable, the Committee's decision was reasonable. In this case, this problem of authority is hotly contested.

The appellants argue that any authority given to the Joint Committee must be found in Article 4, Section 5. If there is an absorption, the Joint Committee has jurisdiction of the merits. The Committee found that it had no jurisdiction to proceed further when it found no absorption. Under this view, it is concluded, the Joint Committee decision being "jurisdictional," that the courts may grant full, broad review of the decision.

The Supreme Court, in Humphrey v. Moore, 375 U.S. at 345–346, 84 S.Ct. 370, fn. 8, in dealing with the Committee's "power" to decide that a transfer of operating authority was an "absorption," supported this view in saying that a section closely similar to Article 4, Section 5, of the Agreement in this case,

"* * * by its own terms appears to limit the authority of the committee to disputes over seniority in the event of an absorption. Reconciliation of these two provisions, going to the power of the committee under the contract, itself presented an issue ultimately for the court, not the committee, to decide."

The appellees, on the other hand, maintain that the District Court was correct in concluding that Article 6, Section 6, was the sole source of the Joint Committee's authority in the first instance (231 F.Supp. at 715), as this was a dispute over contract interpretation within the intent of that section. This theory leads to the conclusion that the Agreement, having specified a private body to make contract interpretations (whether there was an absorption), the Joint Committee's interpretation can be attacked only by a showing of fraud or deceit.

As we read the several contract provisions outlined above and consider them as part of an entire agreement, we think the appellants are substantially correct. Under Article 4, Sections 1–3 seem concerned with seniority disputes between employees and employer within the setting of a continuing industrial relationship: controversies over the layoff, sick leave, or recall provisions. Section 4 addresses itself to the Union's problems of maintaining seniority for its members when the employer sells his business to another or attempts to lease part of the operation to another. The buyer or transferee may not be unionized or may have his own seniority system, and this section seeks to bind the employer-seller or tranferor to make the as-

12. See Rothlein v. Armour & Company, Inc., 391 F.2d 574 (3rd Cir., 3/26/68).

sumption of the collective agreement a term of the sale, transfer or lease. Such would vastly assist the Union's position with the new employer. In the present case, Eastern falls within the scope of this section as a seller. It might have been argued that M & G, also a party to the multi-employer agreement, was bound to Section 4 as an implied term of its purchase and, accordingly, had agreed to honor the Eastern seniority. Presumably that is why the Joint Committee's decision held this section inapplicable despite the singular focus of the hearing and arguments on Section 5.

Section 5 appears as an effort of the unions to hedge or protect themselves against another union with rights similar to those in Section 4. Section 5, since another labor agreement including its seniority provisions might be made a term of any absorption, merger, etc., seeks to remove at least seniority from any such deal and provide instead that seniority will not be settled by the employers alone but between the unions and the surviving employer. With due attention for the scheme of this contract and the explicit reference in Section 5 to the Article 6 grievance procedure, the contract seems to contemplate that after the business deal, resort will then be had to the grievance machinery (Joint Committee) to resolve any lack of "mutual agreement" on a post-absorption seniority matter. As noted above at pp. 5–6, the parties considered the possible application of Article 4, Section 5, as the "issue involved" (see footnote 4). Since Article 4 appears within the entire contract as the Article governing all seniority problems,[12a] its application to the dispute through a finding of "absorption" is an important consideration even though Article 6, Section 6, also might apply if

Article 4, Section 5 (containing the specific language for seniority matters) was to be subordinate to Section 6's general language. Section 5 refers to an industrial solution to be reached by the *"Unions* involved." In some situations one (or more) of those Unions would not be a party to the employer's agreement and, therefore, would not be bound by Section 5 to look to the Joint Committee to solve the seniority dispute by interpreting the contract.[13] Accordingly, we conclude that the Joint Committee on this record should have proceeded under Article 4, Section 5, to determine the controversy with respect to seniority.

### III.

The complicating factor in this case is that the same Union represents both groups of employees. This places the Union in a severe dilemma. If they take one side, they jeopardize their position as Union for the employees of the surviving company, M & G. If they take the other, they may jeopardize their relationship as representative of other units of employees, some of whom may in the near future seek seniority "dovetailing" at a strange plant. Local 107's attempt to be "neutral" before the Joint Committee and their subsequent change on the first appeal to advocacy of the appellants' position does not show bad faith any more than it shows breach of its duty of fair representation. Neutrality may have been the only practical position to take before the Joint Committee and the subsequent change of position may be an attempt to save their relationship at other plants, since court reversal of such Committee's decision can occur only in limited circumstances.

Nonetheless, the private decision process under this Agreement contemplates

---

12a. For example, Article 4 provides for terminal seniority and in Section 3 states: "A list of the employees arranged in the order of their seniority shall be posted in a conspicuous place at each respective terminal." The dispute should be resolved with consideration of such language as background policy, although the merits decision is solely for the Joint Committee.

13. In this situation, if the employer follows any seniority request of the non-party union, the objecting union, party to the Agreement, would take its lack of "mutual agreement" with the employer to the Joint Committee.

an adversary proceeding with an effective conflict of positions over a seniority dispute, "effective" meaning opposition between parties having some voice in the decision of the Joint Committee. This essential opposition was lacking in this case and calls into doubt the reasonableness of the Joint Committee's decision regardless of which contract provision empowered the determination. If Local 107 was genuinely neutral, the management half of the Joint Committee was most probably not.[14] The more total seniority its employees had (and "dovetailing" would probably increase such seniority),[15] the more M & G would have to pay in certain seniority-based fringe benefits. Moreover, although Joint Committee Chairman Matheson and his firm represented both M & G and Eastern, with only M & G surviving, it is unrealistic to regard him as so neutral in a labor controversy such as the one at bar that he would argue against the M & G president (his client) in bringing out any legal matters that would depreciate the force of his client's contentions. Consequently, the cause of the Eastern employees had, practically, an extremely small chance of success; no decision-maker with any power would take their side. The Supreme Court observed in Humphrey v. Moore that the complaining employees did not suggest any additional facts or theory which could have been added if they had been differently represented. But in Humphrey v. Moore,

unlike the present case, of the two employers involved, neither had gone out of business as has Eastern.[16] Accordingly, the management vote in Humphrey v. Moore had a substantial chance of not being unified and the arguments of each group of employees had a substantial chance of being forcefully and competently presented and genuinely considered regardless of the Union's position.[17]

■ For the above reasons, we think the "jurisdictional" decision of the Joint Committee must be rigorously scrutinized for reasonableness. Contrary to the Supreme Court observation in Humphrey v. Moore, 375 U.S. at 351, 84 S.Ct. at 372, on this record we definitely cannot say it is "idle speculation to assume that the result would have been different had the matter been differently presented." The argument for there having been an absorption of business in this case was made only by employees and their shop stewards. They were opposed by the arguments and unanimous vote of experienced businessmen, lawyers, and professional union agents.

■ As outlined above, under the Agreement in this case, the consideration of "absorption" was a jurisdictional decision in the Joint Committee's opinion. In the event M & G absorbed the business of Eastern, then the Joint Committee could solve the "merits" of a seniority dispute submitted to it under the last sentence of Article 4, Section 5. The decision that there was no absorption

---

14. We think it a fair assumption on this record and in light of the contractual scheme of the grievance machinery that the two halves of the Committee would vote along union-management lines if each took a different position.

15. An affidavit of Charles Weed, M & G's terminal manager, makes clear that higher seniority-keyed costs, as well as a concern for present employee relationships, caused M & G to oppose any dovetailing of Eastern drivers' seniority rights. There was also apparently some minor dispute attendant to the seniority controversy concerning the status of Eastern drivers as employees or "brokers" (owner-operators). This additional factor

complicates any system of logical dovetailing.

16. Humphrey v. Moore, supra, involved two companies who responded to the reduced business by re-dividing their geographic territories on a more efficient basis.

17. The Local in Humphrey v. Moore also changed its position during the course of dispute, only there the Local changed from advocating "bottom of the board" to "dovetailing" before the Joint Committee rendered its decision. The Union's dilemma was probably more acute in Humphrey v. Moore because the "absorbed" employer continued in business in other areas.

meant that M & G could determine seniority as it wanted with respect to the Eastern employees;[18] it was not a seniority problem open for "mutual agreement," the lack of which agreement could then be taken to the Joint Committee. Under federal labor law, we think that this "jurisdictional" question is a proper one for the courts, just as it would be if the question before us were whether or not a given dispute should go to arbitration.[19] And under the standard of Humphrey v. Moore, 375 U.S. at 345–347, 84 S.Ct. 363, we think the decision of the Joint Committee was unreasonable and arbitrary. Moreover, since the adequacy of the proceedings before the Joint Committee was not commensurate with the importance of the "absorption" question presented, the court should scrutinize fully the "jurisdictional" application of Article 4, Section 5. Rothlein v. Armour & Company, Inc., supra.

We think that the present record shows M & G absorbed the business of Eastern. The contrary argument, based on a characterization of the Agreement as solely a sale of certain specific assets, is an attempt to make the form of a certain commercial and legal transaction govern all the consequences under federal labor law. This is both unsound and illogical. M & G's purchase was not the equivalent of a purchase of land from a real estate broker and trucks from a dealer. Why, in the face of a significant reduction in business from Chrysler, would M & G buy such a large amount of equipment?

The present record amply demonstrates the oral basis of Chrysler's territory allocation. Chrysler was kept fully informed of the proposed sale from the outset and the presidents of Eastern and M & G met with the Chrysler traffic manager to discuss the sale. Although no testimony proves a specific agreement between Chrysler and M & G to transfer the Eastern business, Eastern's president deposed that he naturally supposed M & G would get Eastern's business if they bought the company. This supposition is important, not because it proves an actual transfer or oral assignment of Eastern's business to M & G, but because it shows that the parties entered the assets sale thinking that M & G would service the remaining Eastern dealers not serviced by new railroad deliveries. And after the sale, for whatever reason, this supposed development in fact happened; pending the Joint Committee's decision the appellants continued to deliver to old Eastern dealers for M & G (see finding of District Court, 231 F. Supp. at 712).

In derogation of this showing that M & G "in fact" absorbed some of Eastern's business, M & G and Local 107 pointed to the naked terms of the asset sale agreement and the lack of any transfer or purchase of I. C. C. rights, assets, liabilities or capital stock. In light of the general nature of the phrase "absorbs the business" and the showing that such "business" was based on an oral understanding with Chrysler, not a contract subject to formal transfer, we think that the Joint Committee's decision was unreasonable. The lack of transfer of any I. C. C. rights was totally irrelevant: M & G already had coextensive I. C. C. rights to those of Eastern and the I. C. C. prohibited one carrier from having dual rights to the same geographic area.

The Joint Committee's decision ruled that "there was no corporate acquisition, purchase, or merger within the meaning of Article 4, Section 4 and 5." But this

18. Under the scheme of this Agreement and the 1964 Joint Committee decision, if M & G were to accede to any demands of the Eastern drivers, the M & G drivers would possibly have a dispute under Article 4, Sections 1–3, for breach of their seniority rights. Eastern drivers, however, not employed by M & G and excluded from any Section 5 rights, could only hope for redress by means of a dispute with their old employer, Eastern, through Article 4, Section 4, and only through Eastern would M & G possibly be affected.

19. See John Wiley & Sons v. Livingston, supra; the *Steelworkers* "triology," supra, footnote 10; Humphrey v. Moore, supra, at 345–346, 84 S.Ct. 363, footnote 8.

does not preclude the "absorption of business" which, from our reading of the contract, was intended by the drafters of the Agreement to cover transactions that did not fit any recognized legal pigeonhole. Very specific legal phrases were used when necessary—sale, transfer, assignment, lease, merger, etc. But in Article 4, Section 5, the drafters first mentioned the general word "absorbs" followed later by "or * * * merger of lines." "Absorbs" must refer to something different than "merger" and a reading of the entire section shows that "absorbs" was used in an expansive and general sense.

■ Our decision that the Joint Committee's ruling was unreasonable does not finally solve this dispute. We merely rule that on this record, this seniority controversy should proceed within Article 4 of the Agreement. Having thus exercised our proper judicial function, we return this dispute to the agreed-upon private method of decision. This course is dictated both by the overriding federal labor policy of encouraging private resolution of disputes[20] and by the extremely complicated problems raised in any form of "dovetailing." On this record, the "merits" of this dispute are open to many rational solutions; the parties involved should have the first chance to offer a plan.

Although we are aware that considerable time has passed and significant changes may have taken place in the labor relations of Local 107 and M & G, such considerations would have their proper effect in deciding which of a great many possible seniority solutions is best in this situation. We are confident that the federal labor policy of encouraging responsible private solution of disputes will be advanced in this instance, since Local 107's change of position will distinctly improve the chance of competent and complete presentation of the appellants' contentions and will guarantee a proceeding more adequate under the terms of this Agreement. Moreover, the chance of "deadlocking" the Joint Committee and thus securing arbitration of the dispute is, for the first time, also a distinctly possible alternative. Should the Union again reverse its position to one of neutrality, it ought to make that neutrality genuine by either deadlocking the Joint Committee or, at the very least, seeing that the appellants' position is presented by experienced and competent representatives.[21]

In order to give the chosen contractual scheme a chance to operate fairly and effectively in this complex dispute, (1) the order of the District Court will be reversed; and (2) the District Court will be directed to enter an appropriate order enjoining any party from giving any effect to the January 23, 1964, decision of the Eastern Conference Automobile Transporters Joint Committee. The District Court may decide to retain jurisdiction for purposes of carrying out its injunction, without prejudice to the refiling of an amended complaint should private resolution under the Agreement of this seniority dispute be unavailable or otherwise illegal.

SEITZ, Circuit Judge (dissenting).

The district court decided that under the Collective Bargaining Agreement ("Agreement") the correctness of the Committee's ruling was not subject to judicial review in the absence of relevant fraud, deceitful action or dishonest con-

20. See, e. g., Republic Steel Corp. v. Maddox, supra.

21. Such Union conduct would be particularly appropriate, for instance, if new evidence were added in some way which tended to show, despite the present record, a potentially reasonable basis for the Joint Committee's concluding no Article 4, Section 5, "absorption" had occurred in 1964. It would appear that there are other arguments which might well be advanced on behalf of appellants in further proceedings before the Joint Committee. For example, the possible binding effect of Article 4, Section 4, as to which the appellants would seem to be third-party beneficiaries, might be reconsidered. See p. 13, supra. It does not appear that any arguments directly on this point were made to the Joint Committee.

duct. Having found no such evidence, it dismissed the complaint. The majority apparently agree with the district court that there was no fraud, etc. in this matter. However, I infer from the majority opinion that the issue is seen as one going to the "jurisdiction" of the Committee to decide the particular grievance. So viewed, they test the Committee's decision by a standard of "reasonableness." I cannot agree that under the language of this Agreement the particular grievance issue decided by the Committee—whether the M & G—Eastern transaction involved a merger or absorption—was one going to its jurisdiction. The grievance raised a threshold problem of interpretation for the Committee but, in my view, that matter came quite clearly within the ambit of the substantive provisions of Article 6, Section 6:

> "Unless otherwise expressly provided in this Agreement, any and all disputes, including interpretations of contract provisions, arising under, out of, in connection with, or in relation to this collective bargaining agreement shall be subject to the grievance procedure of the Agreement."

The majority have apparently determined that the broad substantive provision of the quoted Article and Section are not applicable in deciding the Committee's right to make the ruling in dispute. They conclude that they are therefore entitled to test the ruling by a "reasonableness" rather than a "fraud" etc., standard. It is not clear to me how the majority are able to avoid the impact of the substantive provisions of Article 6, Section 6. In my view such provisions are applicable unless it can be said that Article IV, Section 5 (mergers, etc.) is a provision of the kind contemplated by the introductory language of Article 6, Section 6 ("Unless otherwise expressly provided in this Agreement * * *").

There is no doubt that the introductory language of Article 6, Section 6 imposes a limitation on the broad power otherwise conferred on the Committee by that Article and Section. But even if the issue be judged by a "reasonableness" standard, I am unable to find that the Article IV, Section 5 is a provision "otherwise expressly" applicable. Article 6 is headed "Grievance Machinery." The sections thereunder concern themselves solely with the various steps to be taken in processing a grievance. In this setting it seems fair to say that the clause "Unless otherwise expressly provided in this Agreement," refers solely to other provisions of the Agreement which either remove particular grievances, in whole or in part, from the operation of Article 6 or set forth different procedures to cover them.

I think the reasonableness of the foregoing interpretation is supported by an examination of the entire Agreement. For example, Article 8, headed "No Strikes or Lockouts," deals first with those matters which are to be settled by the Committee, and then reads:

> " * * * except for the following direct violations, which are indisputable:

> 1. Non-payment of the established rates provided in Article 20, Section 2, 4(a) and (b).

> 2. Non-payment of health and welfare contributions as provided for in this Agreement.

> 3. Non-payment of pension contributions as provided for in this Agreement."

The quoted language seems to me to remove that particular subject matter from the operation of Article 6.

Article 9(A), Section 3 and Article 9 (B), Section 3, dealing with "Protection of Rights" of employees, both explicitly provide that in processing grievances, the parties may proceed to the Committee "without taking any intermediate steps, any other provisions [in one case 'provision'] of this Agreement to the contrary notwithstanding." The last paragraph of Article 30, Section 2 also contains provisions at variance with some of the mechanics of the grievance procedure set forth in Article 6.

Thus, there are several provisions in the Agreement which, in my opinion, are of the type contemplated by the introductory language of Article 6, Section 6. In contrast, I can find no language in Article IV, Section 5 which removes its subject matter from the operation of the Article 6, Section 6. Nor can I find in it any language which sets forth a procedure which differs from that provided by Article 6. Article IV, Section 5 recites that the Article 6 grievance procedure shall control such matter. One might ordinarily attribute significance to such a particular provision in order to avoid a finding that it serves no particular purpose. But a reading of the Agreement shows that similar language is found in at least 13 other provisions of the Agreement. Thus, the particular reference to Article 6 cannot be accorded significance under the circumstances. Finally, I think the language of footnote 8 in Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363 (1954) is not applicable to the crucial issue in this case because the Supreme Court was not there concerned with an Agreement containing, inter alia, the crucial introductory language of Article 6, Section 6.

In reviewing the Committee's decision I think the Court was required to interpret the Agreement on the basis that the substantive provisions of Article 6, Section 6 were controlling. So viewed, the district court properly concluded that the correctness of the Committee's decision interpreting the Agreement in relation to the M & G—Eastern transaction was not subject to judicial review.

The parties to the Agreement have seen fit to give the Committee rather broad and conclusive power to interpret and apply it. The law, for the most part, honors such provisions. Obviously some grievance determinations will be made which courts will consider "wrong" or "unfair." I confess that such is my reaction to the merits of the Committee's decision here. But, with deference, the "risk" is inherent in according finality to non-judicial determinations.

I would affirm the district court.