428 F.2d 503
 August FULLER et al., Appellants,
v.
HIGHWAY TRUCK DRIVERS AND HELPERS LOCAL 107, an unincorporated association, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and Hemingway Transport, Inc. and Novick Transfer Co., Inc.
 No. 18050.
 United States Court of Appeals, Third Circuit.
 Argued January 9, 1970.
 Decided June 10, 1970.
 Rehearing Denied July 14, 1970.
 
 Edward B. Bergman, Solo, Abrams, Bergman, Trommer & Padova, Philadelphia, Pa., for appellants.
 F. Emmett Fitzpatrick, Jr., Philadelphia, Pa., for appellees.
 Before BIGGS, VAN DUSEN and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 BIGGS, Circuit Judge.
 
 
 1
 The plaintiffs-appellants at all relevant times were and are members of Highway Truck Drivers and Helpers Local 107 and were employed as truck drivers by Novick Transfer Co., Inc., an interstate carrier, at its Philadelphia terminal. Novick merged with Hemingway Transport, Inc., another interstate carrier, which became the surviving company. At the time of the merger, Hemingway, Novick, and Local 107, the exclusive bargaining agent for the Philadelphia terminal employees of both carriers, were parties to a multi-employer, multi-union collective bargaining agreement. As soon as the merger was completed and the plaintiffs became employees of Hemingway at its Philadelphia terminal, the issue was presented whether they should retain their Novick seniority dates or be placed below the original Hemingway drivers on the combined seniority list. The process sought by the appellants is called "dovetailing" while that urged by the defendant-appellee, Local 107, and by the original Hemingway drivers is described as "foot-of-the-list".[1]
 
 
 2
 The suit at bar is one for damages and injunctive relief under Section 301 of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 185. The issue presented is whether Local 107 breached its duty of fair representation by the manner in which it participated in the resolution of the seniority dispute. The appellants applied for a preliminary injunction which was denied them by the District Court, 228 F.Supp. 287 (E.D.Pa.1964). The case then came on for hearing for a permanent injunction and for damages, in all material respects on the record which was before the district court on the application for a preliminary injunction. The appellants were again denied relief and the appeal at bar followed.
 
 
 3
 The case has a complicated history which we set out in some detail to the end that the dispute between the parties may be plain.
 
 
 4
 The District Court made, among others, the following findings of fact:
 
 
 5
 "8. Both the Hemingway drivers and the Novick drivers took the seniority dispute to Local 107. The business agent of Local 107 who had the responsibility of representing both groups of drivers was Joseph Westenberg, to whom both groups of drivers turned.
 
 
 6
 "9. The initial meeting between the stewards from Hemingway and Novick and agent Westenberg was held on December 27, 1963, at the office of the Union. The Novick drivers were represented by their steward, Joseph Morris, and the Hemingway drivers by their steward, Joseph Mautz. At that meeting, agent Westenberg decided that the two seniority lists would be separately maintained until the dispute over seniority was resolved.
 
 
 7
 "10. On January 10, 1964, a second meeting was held at Local 107's offices. Present at this meeting were Westenberg, two other officers of the union and an attorney representing the union, Hemingway's district manager, three stewards from Hemingway (including Mautz) and two stewards from Novick (including Morris).
 
 
 8
 "11. At this meeting, Hemingway's district manager stated that Novick had some outstanding unpaid bills but that it was not insolvent.[2] Morris took a position in favor of dovetailing the two seniority lists, and the Hemingway stewards opposed him. Westenberg then suggested calling the Teamster International Headquarters in Washington, D. C., for their recommendation on the dispute. Westenberg spoke to James Harding, special representative of the General President of the International, James Hoffa. Westenberg told the parties then present that the International favored dovetailing the two lists. Westenberg then stated that the Hemingway stewards had the right to file a grievance objecting to the International's proposed solution, and that both he and Al Berman, another business agent of Local 107, would sign the grievance.
 
 
 9
 "12. On January 14 or 15, agent Westenberg and Hemingway steward Mautz made a trip to Teamster Headquarters in Washington, D. C. Westenberg and Mautz visited James Harding, the same International representative who advised Westenberg by telephone on January 10 that the International favored dovetailing the Novick drivers. Mautz presented the Hemingway drivers' point of view to Harding in the presence of Westenberg.
 
 
 10
 "13. Westenberg did not tell any of the former Novick drivers that he was making this trip to Washington. The former Novick drivers learned about the trip on or about February 3, 1964, after the Joint Area Committee decision.
 
 
 11
 "14. The grievance procedure under the Master Agreement provides both for a Joint Local Committee and for a Joint Area Committee, each composed of equal union and management representation. The Joint Local Committee was omitted in the processing of this seniority dispute.
 
 
 12
 "15. The Joint Area Committee is composed of representatives of the employer and of the six unions which are parties to the Master Agreement. The rules of the Joint Area Committee provide that no representative of the local union or the employer involved in the dispute can act as a committee member. This rule was observed.
 
 
 13
 "16. The Joint Area Committee hearing to consider the seniority dispute was held in Philadelphia on January 20, 1964. William Fontaine, at that time a representative of the International, presided over the hearing.
 
 
 14
 "17. The hearing was attended by agent Westenberg, several Hemingway stewards, and the Novick steward, Morris.
 
 
 15
 "18. Morris received three days notice of the hearing from one of the Hemingway stewards, John O'Neill.
 
 
 16
 "19. Westenberg supported the position of the Hemingway drivers and requested the Committee to place the former Novick drivers at the foot of the combined seniority list. He referred to the prior merger of Brooks into Hemingway, in which the Brooks drivers had been placed at the foot of the list, and pointed out the unfairness of dovetail to the ex-Brooks drivers.
 
 
 17
 "20. Morris stated that the contract provisions provided for dovetail, and that though it was admittedly unfair in the case of ex-Brooks drivers, it was his opinion that dovetail was the proper resolution of the dispute.
 
 
 18
 "21. On January 20, the Joint Area Committee unanimously decided that the former Novick drivers should go to the foot of the combined seniority lists. The decision was implemented on January 21, 1964.
 
 
 19
 "22. The International Teamsters Union did not attempt to influence the outcome of the Joint Area Committee's decision, either on its own initiative or at the urging of representatives of Local 107.
 
 
 20
 "23. Local 107 did not influence the outcome of the Joint Area Committee's decision of January 20, 1964, through contacts with the International Teamsters, and did not contact members of the Joint Area Committee outside that hearing."
 
 
 21
 These findings are fully supported by the evidence.
 
 I. Position of the Parties in the District Court and Conclusions of that Court
 
 22
 The District Court[3] dealt preliminarily with the issue of whether it had jurisdiction to review the seniority dispute in light in Article 7, Section 4(b), of the Master Agreement which provides: "Where the Joint Area Committee by majority vote settles a dispute, such decision shall be final and binding on both parties with no further appeal." The trial court decided correctly that it did have jurisdiction. The Supreme Court has held Area Committee decisions to be final and binding when the parties have designated them as their "chosen instrument[s]" for the definitive settlement of grievances. General Drivers, Warehousemen etc. Union v. Riss & Co., 372 U.S. 517, 519, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963). See also Bieski v. Eastern Automobile Forwarding Co., 396 F.2d 32, 37 (3 Cir. 1968). But it is also settled that an employee may look to the federal courts for relief under Section 301(a) of the Act in order to vindicate his individual rights under a collective bargaining agreement if he demonstrates that his union did not perform its duty toward him, fairly, honestly, and without discrimination. Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L. Ed.2d 842 (1967); Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Bieski, supra.
 
 
 23
 On the merits, the appellants relied at trial upon two specific facts: (1) Westenberg's participation in the hearing before the Joint Area Committee, and (2) his trip to Washington with the Hemingway steward Mautz to discuss the seniority controversy with Harding, a representative of the International. As related above, Westenberg appeared before the Joint Area Committee and argued in favor of placing the appellants at the foot of the list.[4] The district court, however, ruled that there was no inherent impropriety in Westenberg's partiality and found that his testimony and advocacy at the hearing did not constitute dishonesty or hostile discrimination. We need not decide these issues. As to the Westenberg trip to Washington, conducted without notice to the appellants, the district court noted correctly that there was no proof that the Washington visit with Harding affected in any way the final decision of the Joint Area Committee.
 
 II. The Position of Appellants in this Court.
 
 24
 The appellants in this appeal argue in essence, to use their own words, that Westenberg made a "secret attempt to influence" the resolution of the seniority dispute in favor of the original Hemingway drivers and that this requires our setting aside the decision of the Joint Area Committee "without any need [on the part of the Novick drivers] to prove that the secret approach actually influenced the decision of the [Joint Area] Committee." (Emphasis in the original).[5] In support of this position it is contended that the decision of the Joint Area Committee was an "arbitration" at least in the limited sense of being subject to the same standards as are imposed by Section 10 of the United States Arbitration Act, 9 U.S.C. § 10. In this connection appellants rely principally upon the case of Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed. 2d 301 (1968), which holds that an arbitrator has a duty to disclose to the parties any of his dealings that "might create an impression of possible bias."[6] The analogy proposed by the appellants is that Westenberg's visit with Harding created such "an impression of possible bias" which gave rise to a duty of disclosure.
 
 
 25
 Even assuming arguendo that the Joint Area Committee was subject to the standards of the Arbitration Act, we conclude that the doctrine of Commonwealth Coatings is inapposite. Appellants' analogy contains a major flaw. In Commonwealth Coatings it was an arbitrator whose activities and relationships gave rise to the impression of bias, and as an arbitrator he was in a position to directly influence the decision by participating in the deliberations of the arbitrating panel and by casting his vote. Westenberg, by contrast, was not a member of the decision-making body.
 
 
 26
 Finally, we reiterate that there is no evidence whatever that Harding was influenced by Westenberg or that Harding in turn influenced or even attempted to influence the Joint Area Committee or any of its members.[7] We cannot accept the proposition that the Westenberg-Harding meeting standing alone, undesirable as it may have been, so taints the decision of the Joint Area Committee that its decision must be set aside.
 
 
 27
 The judgment will be affirmed.
 
 
 28
 Judge VAN DUSEN concurs in the result.
 
 
 
 Notes:
 
 
 [1]
 The Master Collective Bargaining Agreement here applicable in pertinent part is as follows:
 "Seniority rights for employees shall prevail. Seniority shall be broken only by discharge, voluntary quit, or more than a two (2) year layoff. Any employee on the seniority list who is absent because of illness or injury shall accumulate seniority for the purpose of determining his place on the seniority list. * * * A list of employees arranged in the order of their seniority shall be posted in conspicuous place at their place of employment and a copy to the Union. There may be (at the Union's discretion) one road driver steward and one city driver steward and, in addition, one dock steward per shift in each terminal or operation. Such stewards shall be granted super-seniority for all purposes, including layoff, rehire, bidding and job preference. Any controversy over the seniority standing of any employee on the seniority list shall be submitted to the Joint Grievance Procedure. (Article 7)."
 Article 5, Section 4(a) of the contract provides:
 "The uniform rules as to application of seniority in the case of mergers, purchases, acquisitions and sales, etc. shall be those adopted by the Central States Joint Area Committee."
 The seniority rules adopted by the Central States Joint Area Committee, in relevant part, provide:
 "Application of seniority rules in cases of mergers, acquisitions, sales, etc. under Central States Road and Cartage Agreements.
 
 Merger, purchases, acquisition, sale, etc.
 
 
 
 [1]
 If both carriers involved are solvent then the seniority lists of the two companies should be dovetailed so as to create a Master Seniority List based upon total years of service with either Company. This is known as dovetailing in accordance with years of seniority. * * *
 
 
 [8]
 The parties acknowledge that specific situations may arise which may not be covered by the above rules, or in which the parties may feel that different treatment of the problem is necessary. In such situation, as provided in Article 5, Section 1, the Employer, the Union involved, and the Central States Drivers Council may mutually agree to such disposition of the seniority problems, as in their judgment is appropriate under the circumstances. The Change of Operations Committee shall have the authority to add to or to modify these rules in specific situations presented to it."
 
 
 [2]
 Novick's solvency or insolvency was not considered by the parties to be an issue here. Cf. the provision of "1" relating to mergers set out in note 1,supra.
 
 
 [3]
 The opinion of the District Court is reported at 300 F.Supp. 643 (E.D.Pa.1969)
 
 
 [4]
 See Finding 19,supra.
 
 
 [5]
 The position of the appellants in this court is set out in their "Statement of Question Involved", as follows:
 "In a dispute arising out of placement of the names of employees on a merged seniority list, after the purchase of one motor freight company by another, where the truck driver employees of both companies are represented for purposes of collective bargaining by the same labor union, is it necessary for plaintiffs to prove, in addition to a breach of the duty of fair representation by their union, that such breach also influenced the outcome of the decision reached, where the relationship between the party secretly approached and the decision maker was that of representatives of the same international union?" (Emphasis added.)
 The summary of the argument of the appellants' brief before this court is as follows: "When Local 107, acting through Business Agent Westenberg, has made a secret attempt to influence the outcome of the Joint Area Committee's decision, the union and its representatives on the Committee must be disqualified and the award set aside, without any need to prove that the secret approach actually influenced the decision of the Committee." (Emphasis in the original.)
 
 
 [6]
 This case was decided by the Court of Appeals for the First Circuit, 382 F.2d 1010 (1967). The facts were as follows: One Capacete was a majority owner of Foundation Engineering Company of Puerto Rico (Foundation) which, over a period of years, had performed drilling operations for foundation investigations and laboratory tests of construction material for A. C. Samford Overseas, Inc. (Samford). A dispute had arisen and arbitration was in progress. Capacete was selected as an impartial arbitrator, selected by the other two arbitrators. The operations of Foundation had been performed under Capacete's general supervision and to some extent had required his direct intervention. Capacete was the majority stockholder of Foundation. Capacete also did some work for the architects on the projects involved in the dispute. He had received small payments for his services but none of these related to matters in question in the arbitration, or were rendered during the proceedings. The use plaintiff was Commonwealth. The Court of Appeals for the First Circuit conceded that there was a disturbingly close relationship between Capacete and Foundation, that the failure of Capacete to make disclosures of his relationship to Foundation could be evidence of partiality, and that it would have been "far better" if there had been disclosure of the relationship by him. It decided, however, that the relationship was not close enough to establish "evident partiality" within the Arbitration Act and ruled in favor of Continental Casualty Co., the defendant
 The Supreme Court reversed the decision citing Section 10 of the United States Arbitration Act which requires that an award "procured by * * * undue means" or "where there was evident partiality * * * in the arbitrators" be set aside. The Supreme Court went on to say that § 18 of the Rules of the American Arbitration Association was highly significant, requiring disclosure, and went further, pointing out that the rule was based on the same principle as the 33d Canon of Judicial Ethics.
 
 
 [7]
 The Joint Area Committee hearing was presided over by William Fontaine, who at that time was a representative of the International Union. Finding 16. Appellants emphasize this fact and direct our attention to the hornbook rule of Agency law that "an unincorporated association acts only through its officers and agents." Appellants' Brief at 6-7. But we fail to see the relevance of this principle. Even though both Harding and Fontaine were International agents, Westenberg's visit with the former cannot be deemed the equivalent of a solicitation of the latter. To hold otherwise would imply that wheneverany union agent is secretly importuned every other union agent is, as a matter of law, incapable of rendering a fair ruling.
 We call attention again to cogent findings 22 and 23, which, as we have said, are supported by ample evidence.