Joseph PRICE et al., Appellants,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA c/o Mr. John Greeley, and Eastern Express Inc.

No. 19447.

United States Court of Appeals, Third Circuit.

Argued Oct. 18, 1971.

Decided March 21, 1972.

As Amended May 16, 1972.

See also, D.C., 46 F.R.D. 18.

Edward B. Bergman, Solo, Abrams, Bergman, Trommer & Padova, Philadelphia, Pa., for appellants.

Richard C. Hotvedt, Morgan, Lewis & Bockius, Washington, D. C., for appellee, Eastern Express.

Raymond W. Bergan, Washington, D. C. (Edward Davis, Philadelphia, Pa., Williams & Connolly, Washington, D. C., Davis & Casper, Philadelphia, Pa., on the brief), for appellee International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America.

Before ALDISERT, GIBBONS and MAX ROSENN, Circuit Judges.

## OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

This is an appeal by a group of employees of Eastern Express, Inc. (Eastern), from an order granting summary judgment denying their claim that Eastern and the employees' union, the International Brotherhood of Teamsters, had breached their collective bargaining agreement. The employees had sued under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1970), contending that the decision of the National Grievance Committee, the body set up to settle disputes under their contract,[1] had exceeded its power by ordering that truck drivers transferring from a closed terminal in

---

1. The National Master Freight Agreements commencing February 1, 1964 governed labor relations between the Teamsters Union and many trucking companies in the United States.

Eastern's system be "dovetailed"[2] into seniority lists at the new terminal for job selection, rather than put at the bottom of them.[3]

Whether an employee is placed at the bottom of the seniority list or "dovetailed" into it is important to over-the-road truck drivers in establishing the order of job selection. Different runs take place at different hours and on different days. While some jobs may give a man a semblance of a nine-to-five day, others require working at odd hours and on an irregular pattern. Of equal importance, the different runs often draw different schedules of pay. Men lower on the list may not approximate the income of the men near the top. Finally, those at the bottom of the list may have no regular jobs at all. They are the members of the "extra board" whose income will vary and depend on the amount of traffic the trucking firm carries.

The National Master Freight Agreement for 1967–70 has two pertinent provisions governing this seniority issue. Article 5, Section 5(b) (2) provides:

> When a branch, terminal, division or operation is closed or partially closed and the work of the branch, terminal, division or operation is transferred to another branch, terminal, division or operation in whole or in part, an employee at the closed or partially closed down branch, terminal, division or operation shall have the right to transfer to the branch, terminal, division or operation in which the work was transferred if regular work is there available. *Such employee, however, shall go to the bottom of the seniority board and shall have the right of job selection only in accordance with his seni-*

*ority at such terminal. However, he shall exercise his company seniority at lay-off purposes and all other contract benefits.* (Emphasis ours.)

Section 7 of the same article, however, substantially qualifies the rule laid down in Section 5(b) (2). It provides that:

> *The parties acknowledge that specific situations may arise which may not be covered by the rules set forth in this Article or in which the parties may feel that different treatment of the problem is necessary. In such situation, the Employer, the Unions involved, and the Area, Multi-Conference or National Committees may mutually agree to such disposition of the seniority problems as in their judgment is appropriate under the circumstances.* (Emphasis ours.)

In December 1966 Eastern decided to change its operations at Bedford, Pa., and transfer the sixteen drivers residing there to other locations, primarily Akron, Ohio, Baltimore, Md., and Bethlehem and Philadelphia, Pa. Pursuant to Section 8(e)[4] of the National Master Freight Agreement, the company submitted its plan to the Eastern Conference Joint Area Committee for approval, and requested that the drivers who would be transferred be put at the bottom of the seniority lists at their new terminals for purposes of job selection.

Copies of the proposed change were sent to the various locals whose men would be involved in the changes. All of them were present at the hearing held by the Eastern Conference Joint Area Committee in Washington, D.C., on January 23 and 24, 1967, and stated their views on the question. The locals into which the Bedford men would be transferred favored putting the transferees

---

2. "Dovetailing" of employees is a term used in the trucking industry to refer to a merging of two separate seniority lists upon the transfer of employees of a company from one terminal to another.

3. For all purposes except job selection, employees would retain their seniority under the National Master Freight Agreement. Article 5, Section 5(b) (2).

4. Section 8(e) reads in part: "Present terminals, breaking points, or domiciles shall not be transferred or changed without the Employer first having asked for and received approval from an appropriate committee on change of operations, the members of which shall be appointed by the Joint Area Committee. . . . "

at the bottom of the list, while the Bedford local argued for "dovetailing." The Committee deadlocked and the company withdrew its proposal without prejudice.

Again, Eastern renewed its request which was considered at a hearing held on April 24, 1967. Once more, all the parties were in attendance. The seniority question was thoroughly argued at this session but again, the question was not resolved. The request was renewed once more in June before the Central States Joint Committee after Eastern made requests for changes in several terminals in the Midwest. In July 1967 pursuant to Article 8(a) (1) [5] of the contract a Multi-Conference Grievance Committee met to consider the change of operations. This time the request was approved with the direction that the transferring drivers be dovetailed into the seniority lists at their new terminals. After a special rehearing on March 12, 1968, a Joint Conference Change of Operations Committee approved the change, and on March 15th, 1968, the National Grievance Committee, acting under Section 8(b)[6] of the contract affirmed the decision.

Meanwhile, some drivers from Bedford were transferring voluntarily from that terminal to other points in anticipation of its closing. They relied on the statements of the local union officials in the various cities to which they transferred that they would have to go to the bottom of the seniority list in accordance with the contract provisions. When the rest of the men from Bedford were transferred into the same terminals, they were dovetailed in accordance with the Area Conference's decision. The men who transferred earlier were not permitted to take advantage of the dovetail ruling.

The result of the transfers and dovetailing was that a large majority of the drivers in Philadelphia, Baltimore, and Akron were pushed down on their seniority ladder when the men from Bedford were added to their list. Along with men who had transferred from Bedford before the permitted dovetailing, many of them from Philadelphia and Akron filed suit in the Eastern District of Pennsylvania charging the union and Eastern with a breach of the contract because they had failed to abide by the provisions of Section 5(b) (2). Additionally, the appellants charged the union with a breach of its duty of fair representation by failing to enforce the contract and because of the conflict of interest of persons on the Multi-Conference and National Grievance Committees.

The district court granted summary judgment for the defendants. It held that absent a showing of fraud or deceit and upon a showing that the committees had dealt fairly with the issues presented, it would not inquire into the parties' resolution of the dispute because of national labor policy in favor of private settlement of such matters. A cornerstone of the district court's opinion was Justice Goldberg's concurrence in Humphrey v. Moore, 375 U.S. 335, 352–354, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), which clearly states a preference for permitting management and labor to amend or modify their contracts as they see fit.

Because this concurrence is at variance with the philosophy expressed in the ma-

5. Section 8(a) (1) reads in part: ". . . If upon the completion of such Supplemental grievance procedure, the matter is deadlocked and, as a result, a work-stoppage is threatened, which could involve more than one Conference Area, the matter shall be submitted to a Multi-Conference Committee composed of two employer representatives and two union representatives from each Conference Area involved. . . . ."

6. Section 8(b) reads: "The National Grievance Committee by majority vote may consider and review all questions of interpretation which may arise under the provisions contained in the Master Agreement which are submitted by either the Union Area Director or the designated employer representative; and shall have the authority to reverse and set aside the majority interpretation of any area, regional, or local grievance committee if, in its opinion, such interpretation is contrary to the provisions set forth in the Master Agreement, in which case the decision of the National Grievance Committee shall be final and binding."

jority opinion in *Humphrey* and in the controlling precedent in this circuit, we are compelled to comment on the district court's decision even though we affirm the result it reached.

Justice Goldberg's comments expressed only one of several approaches that have been taken with regard to the difficult problem of adjusting the interests of management, unions, and individual employees in the administration of labor contracts.[7] Section 9(a) of the National Labor Relations Act, as amended, 29 U.S.C. § 159(a),[8] makes clear that the union is to be the sole bargaining representative of the employees. However, the Act strikes a different posture when dealing with the administration of the contract. It recognizes that the individual employee's interest in the contract may not always coincide with those of his bargaining representative. As a result, it permits him to take his grievances directly to the employer without the interference of the union, even though the union is always permitted to be present at the resolution of such disputes.

This statutory compromise was an attempt to balance the interests of management and labor in evolving solutions to problems not covered directly in the contract with the individual employee's right to rely on the contract, as written, to guide his own dealings with his employer.[9] The section, as formulated, recognized that unlike bargaining, contract administration was a three-sided affair, with proper protections to be accorded to each set of interests involved. The fact that the individual could be required to conform to the grievance machinery set out in a contract did not deny his right to enforce what he conceived to be his individual interests in the agreement.

This position was reinforced in 1959, when the Labor Management Reporting and Disclosure Act made it incumbent upon each union to make available to their members copies of the col-

---

7. There seem to be essentially three views on the subject; (1) the collective control approach emphasizes the power of the bargaining parties to control the terms and conditions of employment; (2) the individual rights approach emphasizes the rights of the employee under the collective bargaining agreement; and (3) the statutory approach emphasizes the compromise between the first two views struck in Section 9(a) of the National Labor Relations Act. For a summary of the three views see Summers, Collective Power and Individual Right in the Collective Bargaining Agreement—A Comparison of Swedish and American Law, 72 Y.L.J. 421, 437–441 (1963). For a fuller treatment of the different approaches compare, Rosen, Fair Representation, Contract Breach and Fiduciary Obligations: Unions, Union Officials and the Worker in Collective Bargaining, 15 Hast.L.Rev. 391 (1964) (and further sources cited at 392 n. 6) or Summers, Individual Rights in Collective Agreements and Arbitration, 37 N.Y.U.L.Rev. 362 (1962) with Cox, Rights Under a Labor Agreement, 69 Harv.L.Rev. 601 (1956). See also Blumrosen, The Worker and Three Phases of Unionism: Administrative and Judicial Control of the Worker-Union Relationship, 61 Mich.L.Rev. 1435 (1963) and Cox, Reflections on Labor Arbitration, 72 Harv.L.Rev. 1482 (1959).

8. Section 9(a), 29 U.S.C. § 159(a) reads as follows:

    "(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective bargaining contract or agreement then in effect: *Provided further,* That the bargaining representative has been given opportunity to be present as such adjustment."

9. For a summary of the considerations involved in the legislative history see Danau, Employee Participation in the Grievance Aspect of Collective Bargaining, 50 Colum.L.Rev. 731, 740–747 (1950).

lective bargaining agreement then in force. (29 U.S.C. § 414) This part of the Act's "Bill of Rights" was intended to permit employees to be able to enforce their rights under the contract by allowing them to see what benefits they were entitled to under the agreement. Implicit in this provision was the assumption that absent appropriate amendment of the labor contract, there could be no changes in the agreement that would abrogate rights contained in it. While modification could add to or explain provisions, it could not take away any rights already there.

In 1960, in the *Steelworkers trilogy* [10] the Supreme Court reinforced the Congressional policy set out in Section 203 (d) of the Labor Management Relations Act, 29 U.S.C. § 173(d), that private dispute settlement was the desirable method for settling grievance disputes. The opinions stressed the utility of industrial self-government and the wisdom of having an arbitrator decide problems left by gaps in contracts. It was a way to have the parties smoothly evolve the contract that would govern the relations between them.[11] However, the Court made equally clear that the arbitrator had to base his award on the existing contract and that "when the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." [12] In other words, the Court attempted to strike a balance much akin to that arrived at in Section 9(a): the parties were encouraged to formulate solutions to problems not covered adequately in their contract, but the arbitrator they designated could not ignore decisions already determined in the governing contract.

In 1964, the majority of the Supreme Court in Humphrey v. Moore, supra, re-jected the view adopted by Mr. Justice Goldberg that the union and management had the power to amend the contract. Mr. Justice Goldberg's formulation stressed the needs of the bargaining parties in the administration of the contract to be free to change the contract, even to the extent that such amendment may encroach on the "vested" rights of the individual employees. The majority adopted a more traditional approach and required the parties to operate within the confines of the collective bargaining agreement. Although it affirmed the finding of the Joint Area Committee, it did so only after making a determination that the interpretation involved was reasonable in the light of the contractual language.

■ This circuit has had occasion to interpret the *Humphrey* decision in Bieski v. Eastern Automobile Forwarding Co., 396 F.2d 32 (3d Cir. 1968). The issue in the case was plaintiff's charge that the union had violated the contract by refusing to follow certain procedures required whenever there was an "absorption" of one company by another. The union disagreed, contending there was no "absorption." This court, speaking through Judge Van Dusen, agreed with the plaintiffs that there was an absorption, as specified in the agreement, and that the contractual procedures would have to be followed. This result reaffirms the holding in *Humphrey*. A court will defer to arbitrators or committees when they are exercising their delegated power to decide unforeseen or unresolved problems arising out of gaps or content in the contract. However, it will not allow them to ignore provisions embodied in the agreement: the basic contract rights must be enforced.

10. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

11. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 580–581, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

12. United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).

■ In the present case, Section 5(b) (2) would seem to set out a clear statement of contractual rights whenever a terminal is closed. But Section 7 leaves flexibility to deal with unforeseen situations, permitting the parties to the contract to bargain further on an ad hoc basis whenever a closing occurs. The parties reserved the right to have the employer, the unions involved and specifically designated committees "mutually agree" at some future time to a disposition of the seniority problems as they may determine in their best judgment. Section 5(b) (2) was the rule but in specific situations Section 7 retained the right of the aforementioned parties to find other flexible solutions. They thereby retained their freedom to continue their contract making during the term of the pact. Thus, seniority rights of individual employees under the contract in the event of a closing of a terminal, were subject to further negotiations and agreement under Section 7.

The actions of the membership and the past history of the contract supports this rationale. While it seems that all local officials to whom transferees from Bedford spoke expected Section 5(b) (2) to be adhered to, it is equally clear that the matter was not settled. There was a considerable amount of discussion at each committee meeting about whether the men should be dovetailed or put at the bottom of the seniority list at their new terminal. There is nothing in the record that would lead to the conclusion that such discussions were out of the ordinary, or that the expectation of anyone involved in the proceedings was that the matter was totally concluded by automatic application of Section 5(b) (2).

■ Because the decision then was appropriately reserved for the judgment of the Joint Committee, the result it reached will not be overturned unless dishonest, capricious or beyond its authority under the collective bargaining agreement. General Drivers, Warehousemen & Helpers Local Union, No. 89 v. Riss & Co., 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963), United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); San Francisco-Oakland Newspaper Guild v. Tribune Publishing Co., 407 F.2d 1327 (9th Cir. 1969); Ludwig Honnold Manufacturing Co. v. Fletcher, 405 F.2d 1123 (3d Cir. 1969). Appellants have not contended that dovetailing is not a rational solution to the problem presented when there is a transfer of men from one terminal to another. It is clear that dovetailing is an alternative that has been considered and used before. See *Humphrey,* supra; *Bieski,* supra.

■ We find nothing presented by the appellants to substantiate their charge that their bargaining representative failed to live up to its duty of fair representation of their interests. While the union must give appellants' local officers an opportunity to make their case and then decide the question honestly and impartially, *Bieski,* supra, at 38, we believe they performed their required duties in this case. The record shows that the various committees that considered the problem gave full and protracted consideration to the arguments of both sides. There is no showing that there was any bad faith or discrimination on the part of those who made the final decision. *See* Fuller v. Highway Truck Drivers and Helpers Local 107, 428 F.2d 503 (3d Cir. 1970).

While the procedure for handling grievances in the trucking industry does not include an outside party as the final arbitrator, thereby leaving the Committee open to charges of favoring the side to which it gives relief, this mechanism has been approved by the courts repeatedly. General Drivers, Warehousemen & Helpers Local Union No. 89 v. Riss Co., supra. *See also Humphrey,* supra; *Bieski,* supra. The specific advice of the various local officers of the Teamsters to those drivers who transferred voluntarily from Bedford prior to the terminal's closing that they would have to go to the bottom of the list was understandable and not improper. While they might have done more in the way of cau-

tioning the transferring drivers that they could file a grievance requesting that the seniority system be varied from the rule in Section 5(b) (2), it was reasonable for them to remind the drivers that in all probability they would lose seniority in the transfer. The seeming conflict arising from Sections 5(b) (2) and 7 was bound to cause confusion, but there is nothing to show that by their advice the union's officers intentionally contributed to the inherent problems involved.

The order granting appellee's motion for summary judgment will be affirmed.