OVERSEAS PRIVATE INVESTMENT
CORPORATION, Petitioner,

v.

The ANACONDA COMPANY et
al., Respondents.

Misc. No. 75–192.

United States District Court,
District of Columbia.

July 20, 1976.

Marx Leva, Leva, Hawes, Symington, Martin & Oppenheimer, Washington, D. C., for plaintiff.

John H. Pickering, Wilmer, Cutler & Pickering, Washington, D. C., for defendants.

## MEMORANDUM

FLANNERY, District Judge.

This action challenges the validity of an arbitration decision. Petitioner, Overseas Private Investment Corporation (OPIC), insures business investments in foreign countries. Respondents, Anaconda Copper Company and Chile Copper Company (collectively Anaconda), conducted substantial operations in Chile and contracted with OPIC for protection of their assets. When the Allende government expropriated the property, respondents filed a claim for compensation in the amount of approximately $154,-000,000. Pursuant to the insurance contract, a panel of three arbitrators considered the claim and unanimously found OPIC liable. OPIC, having subsequently learned that one member of the panel was negotiating an affiliation with a law firm which performed limited services related to the arbitration for respondents' counsel, petitions the court to set aside the panel's

decision under 9 U.S.C. § 10 (1970). Respondents oppose the petition and cross-petition for an affirmance of the decision. Following extensive discovery, the matter now comes before the court on cross-motions for summary judgment. The court, finding no genuine issue to exist as to any material fact and respondents to be entitled to judgment as a matter of law, will grant respondents' motion.

Anaconda instituted the arbitration proceedings attacked in this action on November 30, 1972. By September 7, 1974, Mr. Davidson Sommers had been selected as an arbitrator by the parties and consented to serve on the panel. The selection of Mr. Sommers, as well as the two remaining arbitrators,[1] followed extensive screening by both parties, each of whom had to approve the entire panel. During the pre-selection screening period, Mr. Sommers disclosed that he had discussed the possibility of becoming affiliated with several law firms, including Anaconda's counsel, Wilmer, Cutler & Pickering, and OPIC's counsel, Leva, Hawes, Symington, Martin & Oppenheimer. Beginning in late September, 1974, Mr. Sommers entered into serious discussions with the firm of Curtis, Mallet-Prevost, Colt & Mosle. The negotiations went into a lull from December 1974 to mid-April, 1975, then steadily increased in frequency until early September 1975, when Mr. Sommers announced that he was to become "of counsel" to the Curtis firm. During this same period, the arbitration panel, which had bifurcated the case, proceeded towards resolution of the liability question, issuing its opinion on July 17, 1975.[2]

The storm clouds began to gather on September 30, 1975, when Mr. Sommers wrote a letter to the American Arbitration Association stating that he should not serve on the arbitration panel when it reconvened to determine damages. Mr. Sommers arrived at this conclusion after learning that Curtis, Mallet-Prevost had given limited assistance

---

1. The two arbitrators serving on the panel with Mr. Sommers were the Honorable Stanley M. Fuld and Professor Detlev F. Vagts.

2. A tabular chronology of relevant events appears in Appendix A to this memorandum.

to Wilmer, Cutler & Pickering in preparing Anaconda's case for arbitration and had represented Anaconda in the past on two separate matters. According to Mr. Sommers, he had just learned of the Curtis firm's relationship with Anaconda and the arbitration, and did not know of it at the time the panel arrived at its decision on the liability issue.

Curtis, Mallet-Prevost's involvement in the arbitration began on December 19, 1974, when Louis Oberdorfer, lead arbitration counsel for Anaconda, contacted the firm for the purpose of obtaining a back-up translation of a document previously translated by Anaconda house counsel and obtaining an affidavit by a member of the Chilean bar on a narrow issue of Chilean law. The Curtis firm, upon learning the identity of the arbitrators, revealed to Mr. Oberdorfer that it had discussed affiliation with Mr. Sommers in the past, and could not immediately accept the assignments. After the persons conducting negotiations with Mr. Sommers were consulted, both Curtis, Mallet-Prevost and Mr. Oberdorfer concluded that the negotiations were not at a stage where a conflict of interest could arise, although the record leaves some doubt as to whether Mr. Oberdofer was told that the talks were dead or merely dormant. In any event, Curtis, Mallet-Prevost provided the new translation requested and directed Anaconda to a member of the Chilean bar who, with initial aid from the Curtis firm, provided the required affidavit.[3] The Curtis firm's services were completed in large part by early January, 1975, and in their entirety by February 3, 1975. The firm's bill was paid in May, 1975.

None of the foregoing activities revealed to Mr. Sommers that Curtis, Mallet-Prevost was involved in the arbitration. The firm's name appeared in the arbitration record only once, and then in connection with an opinion it had provided Anaconda in 1966 concerning provisions of the insurance contracts construed by the panel. This reference to Curtis, Mallet-Prevost is contained in a two-page handwritten memorandum introduced by OPIC as an exhibit. Mr. Sommers claims to have never seen this memorandum, which was submitted with several other exhibits.

Section ten of Title nine of the United States Code specifies the conditions under which an arbitration decision rendered pursuant to a contract involving interstate commerce must be vacated. Of special relevance to the instant case are subsection (a), which provides for vacation of awards "procured by corruption, fraud, or undue means" and subsection (b), which provides for vacation of awards where the record reveals "evident partiality or corruption in the arbitrators."[4] OPIC contends that the series of "*ex parte* contacts" between Curtis, Mallet-Prevost and Mr. Sommers and Anaconda's failure to disclose the relationship between Curtis, Mallet-Prevost and Mr. Sommers each raise substantial questions about both the means by which the decision was procured and the impartiality of the panel.

---

3. The arbitration panel did not find it necessary to reach the question of Chilean law discussed in the affidavit.

4. Section 10 provides, in full,
   In either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
   (a) Where the award was procured by corruption, fraud, or undue means.
   (b) Where there was evident partiality or corruption in the arbitrators, or either of them.
   (c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
   (d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
   (e) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.
   9 U.S.C. § 10 (1970).

The two theories advanced by OPIC must be viewed in the light of *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), *rehearing denied,* 393 U.S. 1112, 89 S.Ct. 848, 21 L.Ed.2d 812 (1969), the leading case on vacating arbitration awards pursuant to section 10. In *Commonwealth Coatings,* the Supreme Court found an arbitration award invalid because the proceedings lacked an appearance of fairness. The two parties to the arbitration challenged in *Commonwealth Coatings* had each selected one member of the three-man panel on their own, then mutually agreed on a third, supposedly neutral, arbitrator. Not until after the panel reached its decision did the losing party learn that the third arbitrator, an engineering consultant, was regularly retained by the prevailing party, a construction contractor. In fact, the arbitrator had performed services for the contractor on the projects involved in the arbitration. The Court, reading sections 10(a) and 10(b) together, concluded that "any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." *Id.* at 150, 89 S.Ct. at 340. The failure of the arbitrator or the contractor to disclose their relationship to the other party was considered fatal to the award.

■ Contrary to petitioner's reading of *Commonwealth Coatings,* the case does not establish a *per se* rule, requiring vacation of any award surrounded by facts which might, in some minds, create an appearance of bias. Rather, the Court held that each case must be reviewed on its own facts and that an award should be set aside where the panel "might *reasonably* be thought biased. . . ." *Id.* at 150, 89 S.Ct. 337 (emphasis added). As Justice White's concurrence points out, the relationship between the ar-

bitrator and the party must be "more than trivial." *Id.* at 152, 89 S.Ct. 337 (White, J., concurring); *see South-East Coal Co. v. Consolidation Coal Co.,* 434 F.2d 767, 793 (6th Cir. 1970) *cert. denied* 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149, *rehearing denied,* 404 U.S. 877, 92 S.Ct. 28, 30 L.Ed.2d 124 (1971); *Fuller v. Highway Truck Drivers and Helpers Local 107,* 428 F.2d 503, 508 (3d Cir. 1970); *Brewery Workers Joint Local Executive Bd. v. P. Ballantine and Sons,* 72 Lab.Cas. ¶ 13,925 at 27,928 (D.N.J. 1973). Further, the burden of proving facts which would raise doubt about the fairness of an arbitration in the mind of a reasonable man rests squarely on the party challenging the award. *Reed & Martin, Inc. v. Westinghouse Electric Corp.,* 439 F.2d 1268, 1275 (2d Cir. 1971).

■ The Court's holding in *Commonwealth Coatings* is somewhat analogous to a *per se* rule insofar as it does not require a judge to probe the mind of an arbitrator, once it is established that the arbitrator actually knew of facts which could impair his judgment.[5] This rule merely recognizes that courts are unable to determine with any great degree of accuracy the subjective impact of knowledge on the human mind. Thus, when the record shows that an arbitrator knew of potentially prejudicial information, the court cannot conclude that there was not actual bias, and the issue must be resolved by use of a *per se* rule, or irrebuttable presumption, expressing a policy judgment. *Per se* rules are admittedly imprecise tools, but they ensure that those errors which inevitably occur are of the type least inconsistent with general policy goals. The need for these presumptions vanishes when the question is not what effect certain information had, but whether the information was ever known. Courts

---

5. The dissenting opinion in *Commonwealth Coatings,* the only opinion in which the term "*per se*" appears characterizes the majority holding as follows:

> [I]f an arbitrator has any prior business relationship with one of the parties of which he fails to inform the other party, however innocently, the arbitration award is always subject to being set aside.

393 U.S. at 153, 89 S.Ct. at 341 (Fortas, J., dissenting). This rule is far narrower than that urged upon this court by OPIC, since its implicit foundation is that the arbitrator actually knows of the relationship. OPIC does not consider the arbitrator's knowledge an essential ingredient.

regularly resolve this question with such great accuracy that not only the existence of actual bias, but the appearance of bias, can be completely dispelled. *Commonwealth Coatings* demands no more.[6]

Neither of OPIC's two theories raise doubts as to the fairness of the arbitration, within the meaning of *Commonwealth Coatings,* because they fail to prove that the arbitrator actually received prejudicial information. OPIC first contends that the series of "*ex parte* contacts" between Mr. Sommers and the Curtis firm create the appearance of bias because it is impossible for the court to conclude that subtle attempts to influence the arbitration were not made at these meetings. This conclusory assertion cannot sustain petitioner's burden, especially when all the evidence in the record is to the contrary. The pattern of the meetings, for instance, bears no correspondence to crucial dates in the arbitration. Indeed, the talks subsided several weeks before Curtis, Mallet-Prevost entered the case and did not resume until several months after the firm completed its assignments. Given the limited involvement of the Curtis firm in the arbitration, there is no reason to believe that the contacts with Mr. Sommers were anything but innocent and unrelated to the arbitration. Further, contacts of this nature are to be expected during the course of an arbitration. As the Court observed in *Commonwealth Coatings,* "[A]rbitrators cannot sever all their ties with the business world, since they are not expected to get all their income from their work deciding cases. . . ." 393 U.S. at 148–49, 89 S.Ct. at 339. Mr. Sommers' efforts to associate himself with a respected law firm fall squarely within this statement. To hold that talks with a nonparty raise a reasonable doubt about an arbitrator's credibility because that firm was associated in a minor way with an arbitration, would force arbitrators to completely isolate themselves during the pendency of a case.

OPIC argues that Curtis, Mallet-Prevost should not be viewed as a non-party who performed minimal services for Anaconda, but should be considered full-fledged counsel for the entire arbitration. If Curtis was Anaconda's counsel, the numerous meetings with Mr. Sommers would, no doubt, create the appearance of bias. Unfortunately for OPIC, the contention that the Curtis firm was Anaconda's counsel flies in the face of the record, common sense, and normal legal practice. The Curtis firm performed very minimal tasks in a highly specialized area for a limited period of time. The firm did not appear on the record, did not assist in the planning of strategy for the overall arbitration and did not contribute to the arbitration in any way, once its tasks were completed in February, 1975. Indeed, its bill was paid in full in May, 1975, months before the proceedings reached their conclusion.

6. Although not controlling, the statute and canons governing judicial disqualification reinforce the conclusion that, barring special circumstances, *Commonwealth Coatings* establishes a rule of reason. The recently enacted statute on judicial disqualification describes five circumstances in which disqualification is mandatory. *See* 28 U.S.C. § 455(b) (Supp. IV 1974). Parties may not waive disqualification in these cases. 28 U.S.C. § 455(e) (Supp. IV 1974). In all other cases, disqualification is necessary only where a judge's impartiality may *reasonably* be questioned and the parties do not agree to a waiver. 28 U.S.C. § 455(a), (e) (Supp. IV 1974); *see Parrish v. Board of Commissioners,* 524 F.2d 98, 103 (5th Cir. 1975); *Davis v. Board of School Commissioners,* 517 F.2d 1044, 1052 (5th Cir.) *rehearing denied,* 521 F.2d 814 (1975). When enacting the new statute on disqualification, Congress intended to codify the standards adopted by the American Bar Association in Judicial Canons 2 and 3C. *See* H.R.Rep. No. 93–1453, 93d Cong., 2d Sess. (1974). In adopting the ABA standards, Congress understood that it was making applicable to judges the same standards made applicable to arbitrators in *Commonwealth Coatings. See* Hearings on S.1064 Before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 93d Cong., 1st Sess. at 114 (1973).

In addition to supporting the conclusion that *Commonwealth Coatings* sets out a rule of reason for most cases, the statute and canons on disqualification support the application of a rule of reason to the instant case. As stated above, the statute and canons require a *per se* rule to apply in only five specified situations, and the facts of the case at bar do not correspond to any of the five.

The cases cited by OPIC in support of its contention that Curtis, Mallet-Prevost served as a "secret friend" for Anaconda are inapposite. Primary reliance is placed on *DeCorte v. New York Central R.R.*, 377 Mich. 317, 140 N.W.2d 479 (Mich.1966). In *DeCorte*, a jury verdict was reversed because a court officer, assigned to another courtroom, entered the jury room and fraternized with the jurors. This same officer was a friend of the plaintiff and had been transporting her to and from the courthouse. Not only are the circumstances of the contacts much more egregious in *DeCorte* than in the case at bar, but juries are traditionally protected from outside interference much more scrupulously than are arbitrators and judges.

■ Petitioner's second theory, that failure of counsel for Anaconda to disclose its knowledge of the relationship between Mr. Sommers and Curtis, Mallet-Prevost creates an appearance of bias, is also deficient. Petitioner cites no case where an arbitration decision was overturned because of failure of a party to disclose facts not known to the arbitrator. OPIC asserts that the duty of a party to disclose potentially prejudicial information is a natural corollary of the requirement expressed in *Commonwealth Coatings* that arbitrators disclose such information. This proposition does not withstand prolonged scrutiny. When the existence of a potentially prejudicial relationship is not known to an arbitrator, there is no possible way in which the relationship can affect his decision. Thus, disclosure would serve no purpose. *See Fuller v. Highway Truck Drivers and Helpers Local 107*, 428 F.2d 503, 508 (3d Cir. 1970); *Brewery Workers Joint Local Executive Bd. v. P. Ballantine and Sons*, 72 Lab.Cas. ¶ 13,925 at 27,928 (D.N.J.1973).[7]

■ Even if the law did impose on parties a duty to disclose potential conflicts not known to arbitrators, counsel for Anaconda never knew any facts meriting communication. Reading the record most favorably to OPIC, it appears that Wilmer, Cutler & Pickering merely knew that Curtis, Mallet-Prevost had talked with Mr. Sommers at one time, but that the talks were dormant. This information is of little consequence. Had the talks never resumed, no charges of bias could possibly be sustained. The knowledge of the Wilmer firm remained at this level for the duration of the proceedings. Only Curtis, Mallet-Prevost knew of the escalating contacts with Mr. Sommers and, as stated above, the suggestion that the firm should be considered Anaconda's counsel at the time these contacts occurred is unacceptable.

■ In light of the above, the court concludes that no reasonable man could find Mr. Sommers to have known any potentially prejudicial information prior to the July 17, 1975 award. Absent such a finding, no reasonable man could conclude that the tribunal was biased or appeared biased. Absent bias or the appearance of bias, the arbitration decision must be affirmed. An appropriate Judgment accompanies this Memorandum.

## APPENDIX A

### Chronological Table

| Date | The Arbitration | Communications Between Curtis Firm and Arbitrator |
|---|---|---|
| November 30, 1972 | Anaconda institutes arbitration. | |

7. OPIC contends that Mr. Sommers must be charged with "legal" or "constructive" knowledge of the relationship between Curtis, Mallet-Prevost and Anaconda because the arbitration record contained a reference to the 1966 matter in which the Curtis firm participated. Imputing knowledge of potentially prejudicial information runs contrary to the logic underlying the disqualification rule, since it is only actual knowledge which can affect the decision-making process. The appearance of Curtis, Mallet-Prevost's name in the record is of some significance insofar as it casts doubt on Mr. Sommers' claim that he knew nothing about the Curtis firm's activities, but the obscurity of the memorandum in which the name appears nullifies any such impact it may have.

APPENDIX A—Continued

Chronological Table

| Date | The Arbitration | Communications Between Curtis Firm and Arbitrator |
|------|-----------------|---------------------------------------------------|
| December 26, 1974 | The Curtis firm is formally retained as counsel to Anaconda. | |
| January 6–8, 1975 | Evidentiary hearings are held. | |
| Middle of January, 1975 | | Mr. Munyan calls Mr. Sommers. |
| January 16–17, 1975 | Final evidentairy hearings are held. | |
| February 7, 1975 | The factual record is completed. | |
| March 14, 1975 | First briefs are submitted. | |
| April 2, 1975 | Reply briefs are submitted. | |
| April 11, 1975 | Oral argument is held. | |
| April 14, 1975 | : | Messrs. Sohier and Brown have a private luncheon meeting with Mr. Sommers. |
| Early May, 1975 | : | Messrs. Gross and Sommers talk on the telephone. |
| May 29, 1975 | : | Messrs. Sohier and Brown have another private meeting with Mr. Sommers. |
| June 3, 1975 | : | Messrs. Brown and Sommers talk on the telephone. |
| June 7, 1975 | : | Messrs. Brown and Sommers again talk on the telephone. |
| June 17, 1975 | : | Messrs. Brown and Sommers again talk on the telephone. |
| June, 1975 | : | Messrs. Brown and Sommers meet on one or more occasions while inspecting potential new office space. |
| June 19, 1975 | The Arbitration Tribunal Deliberates an Award. | Messrs. Campbell and Sommers talk on the telephone. |
| June 23, 1975 | : | Mr. Sommers meets Curtis firm attorneys in New York and has a private luncheon with some partners of the Curtis firm. |
| July 2, 1975 | : | Mr. Campbell writes to Mr. Sommers asking him to resign as a Howmet director. |

APPENDIX A—Continued

Chonological Table

| Date | The Arbitration | Communications Between Curtis Firm and Arbitrator |
| --- | --- | --- |
| December 1, 1972 | Procedure to select arbitrators begins. | |
| May, 1973 | | Informal discussions between Mr. Sommers and Mr. Gross concerning "of counsel" affiliation are suspended. |
| September 7, 1974 | Mr. Sommers agrees to serve as an arbitrator and attends pre-hearing conference in Washington, D.C. | |
| September 24, 1974 | | Mr. Sommers meets with Mr. Gross and "of counsel" discussions are resumed. |
| October 7, 1974 | | Mr. Sommers writes to Mr. Gross. |
| October 21, 1974 | | Mr. Gross writes to Mr. Sommers. |
| November 1, 1974 | | Mr. Sommers meets with Mr. Campbell in Washington, D.C. |
| November 4, 1974 | Pre-hearing conference held in Washington, D.C. | |
| November 5, 1974 | | Mr. Sommers advises Mr. Campbell that Sommers' application for membership in the District of Columbia Bar has been approved. |
| December 2, 1974 | Pre-hearing conference held in Washington, D.C. | |
| December 4, 1974 | | Mr. Sommers writes to Mr. Gross. |
| December 19, 1974 | Mr. Oberdorfer seeks to retain the Curtis firm, and Messrs. Munyan and Angulo telephone Mr. Gross. | |
| December 20, 1974 | Mr. Angulo and a Curtis associate meet with an associate of the Cutler firm to begin the Curtis firm's assignment. | |
| A few days before Christmas, 1974 | | Mr. Gross tells Mr. Munyan, the managing partner, that he "ought to get moving" on the Sommers "of counsel" affiliation. |
| December 25, 1974 | | Mr. Gross writes Mr. Sommers. |

APPENDIX A—Continued

Chonological Table

| Date | The Arbitration | Communications Between Curtis Firm and Arbitrator |
|---|---|---|
| July 11, 1975 | : <br> : <br> : <br> : | Mr. Campbell writes again to Mr. Sommers concerning his resignation as a Howmet director. |
| July 17, 1975 | Award on liability is issued in favor of Anaconda. | Mr. Sommers informs Mr. Campbell that he will resign his Howmet directorship by October 1, 1975. |
| July 21, 1975 | | Messrs. Campbell and Sommers talk on the telephone. |
| July 22, 1975 | | Messrs. Brown and Sommers meet. |
| August, 1975 | | Messrs. Brown and Sommers have several telephone conversations. |
| Mid-September, 1975 | | "Of counsel" affiliation of Mr. Sommers to Curtis firm, effective as of September 1, 1975, is announced. |
| September 30, 1975 | Mr. Sommers resigns as Arbitrator. | |

---

## JUDGMENT

This matter comes before the court on cross-motions for summary judgment. Upon consideration of the motions, memoranda submitted in support thereof, oral argument thereon, and the entire record herein, and for the reasons stated in the Memorandum filed by the court this date, it appears to the court that there exist no genuine issues as to any material fact and it further appears that respondents are entitled to judgment as a matter of law. Therefore, it is, by the court, this 20th day of July, 1976,

ORDERED, ADJUDGED and DECREED that respondents' motion for summary judgment should be, and the same hereby is, granted; and it is further

ORDERED, ADJUDGED and DECREED that petitioner's motion for summary judgment should be, and the same hereby is, denied; and it is further

ORDERED, ADJUDGED and DECREED that judgment be entered for respondents.