Andrew MASULLO et al., Plaintiffs,

v.

GENERAL MOTORS CORPORATION and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America. Defendants.

Michael SAKALA et al., Plaintiffs,

v.

GENERAL MOTORS CORPORATION et al., Defendants.

Civ. A. Nos. 658–72, 1377–72.

United States District Court,
D. New Jersey.

April 29, 1975.

Mandel & Davis, Newark, N. J., for plaintiffs Masullo, and others.

Craner, Brennan & Nelson, Elizabeth, N. J., for plaintiffs Sakala, and others.

Carpenter, Bennett & Morrissey, Newark, N. J., for defendant General Motors Corp.

Paul J. Giblin, Hackensack, N. J., for defendant International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and Local 736, U. A. W.

## OPINION

LACEY, District Judge.

### PRELIMINARY STATEMENT

A bench trial of these two consolidated actions was held before me on March 3–5, 1975. Involved are a company's merging of operations and conflicting work seniority claims of two groups of employees, which in Civil Action 1377–72 consisted of former General Motors Harrison plant employees (hereinafter referred to as "Sakala"), and in Civil Action 658–72 of General Motors Clark plant employees (hereinafter referred to as "Masullo"). Subject matter jurisdiction lies under Section 301(a) of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. Sec. 185(a).

Proofs were jointly submitted by the parties in the form of "Agreed Exhibits" (See "Statement of Agreed Exhibits" for index thereof); "Stipulation Regarding Deposition Transcripts" of John C. Edwards, William Hess, Robert W. Clark, Leo R. Haley, Paul Phillippe and Irving Bluestone; stipulations as embodied in "Joint Preliminary Proposed Findings of Fact", and oral stipulations in the course of trial (T16–17, 388). Plaintiffs called 10 witnesses in support of their conflicting claims. Defendants called no witnesses; but moved for judgment under F.R.Civ.P. 41(b) and 52(a) in both actions. Post-trial briefs and proposed Findings of Fact and Conclusions of Law have been filed in support of said motions and on the case in its entirety.

The only issue to be determined at this juncture is whether the defendants, Local and International Unions, or either of them, violated a duty of fair representation to the plaintiffs under Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) and Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964).[1]

The claims against the Unions and the Corporation of breach of the collective bargaining agreement (National Agreement) have been deferred, the plaintiffs having demonstrated their understanding that unless they succeed in their actions against the Unions, or either of them, for alleged unfair representation, the contract claims must fail.

### THE FACTS

This suit results from the merger into the Corporation's Clark Township, N. J., plant of certain toolroom work formerly performed at its Harrison, N. J., plant. In 1965 the decision was made to close the Harrison plant; and its manufacturing operations were gradually phased out between then and December 1969, and distributed among several plants, including Clark Township, creating the problem of what personnel and how many were required to man the transferred operations at the receiving plant. As will be hereinafter detailed, estimates of the amount of transferred work were made by the Corporation, followed by discussion with the Unions, and ultimate agreement between Corporation and International Union. Such was done pursuant to paragraph 96 of the National Agreement, which in pertinent part provides:

> If the transfer of major operations between plants results in the permanent release of employes with seniority, the case may be presented to the Corporation and, after investigation, it will be reviewed with the Interna-

---

[1]. The Masullo complaint charges the employer with "participation" and "acquiescence" in the International Union's alleged violation of the duty of fair representation. I find no support in the record therefor.

tional Union in an effort to negotiate an equitable solution, in accordance with the principles set forth in the previous paragraph. Any transfer of employes resulting from this review shall be on the basis that such employes are transferred with full seniority.

Since the merger of the Harrison operation into the Clark plant was a transfer of major operations, paragraph 96 was operative.

Hundreds of production and support personnel were involved in the Harrison plant closing and consequent transfers to other plants; however, the dispute at bar is whether there was transferred to Clark sufficient toolroom work to require as many as 34 grinders and toolmakers, as estimated by the Corporation.[2]

Thus, in the numerous negotiations, grievances and appeals, the opposed groups of plaintiffs (or their representatives) made their respective claims based upon conflicting views as to the quantity of Harrison toolroom work transferred to Clark.

The position of the Masullo group was that work for not more than 24 toolroom employees (and indeed considerably less) was transferred. The position of the Sakala group was that work for 34 or more employees was transferred. The resolution of the alleged unfair representation claim does not depend on whether either of these numerical contentions is correct, but rather on an analysis of the Unions' conduct and motivation for the positions they took.

While this case focuses on the differences related to whether sufficient work for toolroom employees was transferred from Harrison to Clark, 415 other employees were transferred without substantial problems.

Prior to the merger, the Harrison toolroom had 60 relatively senior employees, and Clark 150. While both plants produced bearings, and some toolroom jobs in the two plants were similar, it is clear that the operations in the two toolrooms were not identical.

Under the circumstances, therefore, there was no way to measure with accuracy and precision how many jobs—and men—were required to go with the transferred work. When the January 1965 decision to close the Harrison plant was announced, the employees at both Harrison and Clark were concerned. International Union representatives went to both plants in January 1965 to explain generally the manner in which paragraph 96 would be applied. As the Corporation states, the International presented what appears now to have been "an, erroneously optimistic view, but hardly [one that was] a breach of their duty of fair representation." Corporation Post-Trial Memo, 9.

It is clear that there is no calculus to be applied to any transfer of operations and that each differs. What can be said is that the negotiations under paragraph 96 should revolve about an honest and good faith estimate of the number of people needed to perform what, is an honest and good faith estimate of the amount of work to be transferred, with the responsibility lying with management to prepare these estimates, at least at the outset, although of course the right rests with the International Union to review said estimates.

Further by way of background for the specifics which follow, the International Union and not the Local Union has the ultimate responsibility of negotiating with the Corporation the "equitable solution" of paragraph 96, and in these negotiations the International may, if acting in good faith, generally rely upon the estimates of work and manpower prepared by local management, which has the facts at hand as to projected moves and projected need. Here, it is clear, the parties at all times understood

---

2. Assuming the validity of the Corporation's estimate, the men thus included would retain their Harrison seniority for all purposes, including layoffs.

that what was being advanced was a projection or estimate, rather than a precisely accurate figure. Just as the Corporation's Detroit negotiator looks to the local management for its estimates, so the International's negotiator consults with the Locals to attempt verification.

Moving now to the heart of this matter, in 1968 studies were undertaken by the Corporation preliminary to the movement of the toolroom support group from Harrison to Clark. William Hess, Supervisor of both the Harrison and the Clark toolrooms, estimated the number of each classification of people (toolmakers and toolroom grinders) needed to perform the tooling for the product lines which were to be moved. His first opinion was that 24 jobs were needed; later in 1968, prior to the first personnel transfers, Hess determined that work for 34, not 24, additional toolroom grinders and toolmakers would be created in Clark, a number which he and the Corporation still believe to be the best estimate. This toolroom estimate, with estimates of the other crafts, was presented to the Union as a total of 329 employees (with a breakdown indicating 34 toolroom employees). In this regard, it should be noted that the toolmaker's function is supportive but not directly proportional to the plant's output, precluding the likelihood of establishing a fixed relationship between the percentages of toolmakers and production workers.

The International assured the Masullo group that 34 was reasonable. The shop committee nevertheless placed an objection in the minutes of its meeting of March 1968; and various members of the Masullo group attempted to file grievances, but refrained from doing so when it was explained to them that such grievances could not be proven factually until the work had been transferred. From that point, the shop committee representing the Local has never abandoned its opinion that there was insufficient work for even 24 men. This opinion, I find, has never been proved or disproved.

Thereafter, the International and the Corporation negotiated a Memorandum of Understanding, dated June 22, 1968, specifying the conditions under which a total of 329 employees (including 34 toolroom employees) could be transferred with seniority. Subsequently, revised estimates were made which included 34 toolroom employees among a new total of 425 employees. After negotiations, on October 2, 1969 the Corporation and International agreed to modify the memorandum dated June 22, 1968, by substituting the number 425 for 329. The Sakala plaintiffs contend that the International made "apparently some verification" (Sakala Proposed Finding of Fact 19), the Masullo plaintiffs contend it did not. The testimony on this point is not substantial. I find that it did not. I also find, however, that the International could properly rely upon the Corporation's good faith in making its estimate, and that the International, by its conduct thereafter, in connection with the bargaining which led to the reduced figure of 24, demonstrated its responsibility to its members.

The Sakala group transfers, with full accumulated seniority, occurred between August 1968 and early November 1969. As the work was received in the Clark toolroom, it was integrated with the pre-existing Clark work so that some Clark employees did some Harrison work and some Harrison employees did some Clark work.

Difficult as it was to verify the accuracy of the estimates before the work arrived, with the passage of time it became increasingly difficult to do so as work and personnel moved, and particularly so where, as here, the transfers took place not all at once but over a period of fifteen to eighteen months and the work was often of a job shop nature as compared to production line work.

Nonetheless, the Corporation's estimate of 34 did not go unchallenged. Local Union officials, and various Clark toolroom employees independent of the Local, attempted to survey the amount

of work transferred; and based upon these surveys, members of the Masullo group, who generally lacked the seniority of the Sakala plaintiffs, filed grievances alleging violation of the June 22, 1968 Memorandum in that the number of men transferred exceeded the number of jobs.

Meantime, the members of the Sakala group filed grievances based on rumors that the Masullo position was going to prevail. Consequent unrest led to convening of a Union meeting, chaired by International Representative Smith. Members of both the Masullo and Sakala groups were present; and all had an opportunity to speak.

The Sakala group presented a graph showing the work which it believed had been transferred and representatives of the Local gave Smith the grievances which had been filed. Representatives of the Masullo group claimed that obsolete Harrison work was being provided to Harrison workers and that less than 24, indeed only 15 Harrison jobs, were in the Clark plant. The International, within a week of the meeting, conducted an in-plant inspection to determine whether sufficient Harrison work had been transferred for 34 men. Smith was accompanied by representatives of management and of the Local Union. A series of meetings to "finalize" or "close out" the merger ensued.

The parties' positions were always based upon their conflicting estimates of the amount of work transferred. The Corporation continued to maintain that 34 was the correct number. The Local Union held that less than 34 were required. The Corporation offered 28 or 29 as a compromise. The Sakala group at one point offered to prove 38. The Union felt that no more than 13 could be justified but offered to accept 20. The agreed upon 24 was a collectively bargained compromise. *See* Edwards Dep. 10–11; T227. Thereafter at a meeting in Detroit between Edwards of the Corporation and Moran of the International, they authorized their local

representatives to work out a detailed agreement, which was done. At the final meeting, at which the oral agreement was reached, the representatives of the Local successfully protected from layoff those of the Sakala group who, as a result of the agreement, suffered seniority loss. Thereafter, the International instructed it local grievance officers not to accept Sakala group grievances challenging the reduced seniority; however, at least eight grievances were accepted and processed on behalf of Sakala group member Celeste and others on behalf of Sakala himself. When the processing became deadlocked at the local level, the Sakala group pursued their ultimately successful internal union appeal.

Thus, on January 27, 1970, they initiated an appeal under the International's constitution; and shortly a three-man investigating committee arrived in the plant to explore the situation and to try to effect a settlement. The committee, it is clear, carefully reviewed the plant and the toolroom itself to determine the quantity of Harrison work there on that day. The inspection was a thorough one; and both the Sakala and the Masullo groups were apparently satisfied with the procedures used.

The committee concluded that toolroom work for less than 24 had been transferred from Harrison to Clark.

The committee's report was transmitted to the International's Executive Board where a hearing was held in the Cranford Regional Office in August 1970. Both groups appeared and presented their cases. The Board accepted the committee's report on its face as a good faith effort to investigate, but found no "reliable information" as to the amount of work transferred. It rejected the claim of the Sakala group that work for 34 employees existed. It recommended that the International's General Motors Department (per Mr. Bluestone) and the Regional Director (per Mr. Gerber) conduct a study to seek "equitable seniority treatment for all persons involved" in the context of

asserted inequities among the members of the Sakala group.

In May of 1971, following such a study, Messrs. Bluestone and Gerber issued their report, recommending negotiations with the Corporation to adjust asserted intra-group inequities by granting the Sakala group seniority at Clark from the day after the first memorandum, and by rearranging seniority among them accordingly, rather than seniority by date of actual transfer. These recommendations were embodied in agreements with the Corporation in July and September 1971.

On August 15, 1971, the Sakala group, dissatisfied with this result, docketed the appeal to the Convention Appeals Committee of the International.

The Convention Appeals Committee is the International's highest body. It consists of 15 union representatives from throughout the United States and Canada. Following a full hearing on December 7, 1971, it issued a decision directing the International's General Motors Department to effect, through negotiations with the Corporation, a restoration to the Sakala group of their Harrison seniority.

The Masullo plaintiffs contend they were not given a full and fair opportunity to present their case to the Convention Appeals Committee. I find otherwise. *See* T297–298.

Mr. Bluestone conferred with the Corporation, which, faced with demands to restore the Sakala seniority, stated it would agree only on condition that it not be liable for back pay to the Sakala group. Agreement was reached on January 24, 1972, restoring full Harrison seniority to the Sakala group in conformity with the mandate of the Convention Committee. This, claims both the Corporation and the Unions, constituted an "equitable solution" within the intendment of paragraph 96.

The Sakala group argues that the Corporation's original estimate of 34 never should have been revised; that it was revised only because the Local arbitrarily acted to protect its members who are herein named as the Masullo plaintiffs, and that in turn the International arbitrarily acted to accept the Local's position without due consideration of the interests of the Sakala group. Additionally, the Sakala group argues that the Local's position was founded upon ignorance of the Harrison toolroom operation and the differences between it and the Clark toolroom operation; that neither the Local nor the International ever made an appropriate study; that once the transfers occurred no accurate study could be made; that the Local, to bolster its position, threatened an illegal strike; that the meetings of the Local and the International which culminated in the reduction were too often held without representation of the Sakala group; that the burden of proving the original number of 34 was proper should not have been imposed on the Sakala group; that the Local prejudged the grievances filed by the Sakala group; that the reduction from 34 to 24 was a compromise without basis in fact; that the Local was partial to the Masullo plaintiffs and acted arbitrarily adverse to the Sakala plaintiffs and afforded no representation to the latter in dealing with the Corporation; and that the International violated its duty to the Sakala plaintiffs by permitting the Local to so act. Proposed Findings of Fact 56–57. For these reasons, the Sakala plaintiffs contend, they never should have been deprived of their seniority even temporarily.

The Masullo group, of course, sees no merit whatever to the Sakala position, and contends that neither the Local nor International ever verified the estimate of 34; that the Memorandum of Understanding of June 22, 1968, violated paragraph 96 of the National Agreement; that the compromise of 24 worked out in an agreement of December 10, 1969, should have been maintained; that at the final appeal hearing before the Convention Appeals Committee the Masullo group was not properly represented by

the Local; that the final decision was without basis in fact; and that

> The action of the International as aforesaid violates its duty of fair representation owed to the Masullo Group, in that it first acquiesced in a decision of the Corporation that 34 jobs were transferred contrary to its representations to its members; it thereafter neglected to present the arguments of the Masullo Group to the Convention Appeals Committee and misled the Masullo Group in believing that it need not present any argument to said committee; and it disregarded the only factual analysis made of the issue—the determinations of its two fact finding committees and resolved the rights of its members on the basis of unfounded supposition and conjecture. The Corporation having agreed in December 1969 that 24 was the appropriate figure entered into the January 1972 agreement contrary to the demonstrable facts.

*See* Masullo Proposed Findings of Fact 26; *see also* Masullo Proposed Findings of Fact 17–25.

■ I have examined all of the foregoing claims, and others, raised by the plaintiffs. For the reasons hereinafter set forth, the claims of both groups that the Local and International violated their duty of fair representation must be denied.

### THE LAW

■ We are faced with, then, competing contentions of the Sakala and Masullo groups that the defendant Unions unfairly preferred one at the expense of the other at various decision and appeal stages, thereby breaching their duty of fair representation. As all parties concede, to succeed in such a claim requires proof of arbitrary, discriminatory, or bad faith conduct. Plaintiffs' burden in this case is made even heavier by the fact that the controversy revolves around whether the International accomplished, under paragraph 96 of the National Agreement, an "equitable solution" to the controversy between the Sakala and Masullo groups.

■■ Congress and the courts have given unions extended authority and discretion to reconcile and accommodate the competing interests of the various groups they represent. This policy evolves from a recognition that, overall, the individual interests of employees are best served by collective action. Emporium Capwell Co. v. Western Addition Community Organization, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12. (1975); NLBR v. Allis-Chalmers, 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); *cf.* Harris v. Chemical Leaman Tank Lines, Inc., 437 F.2d 167, 171 (5th Cir. 1971). In negotiating any agreement a union almost necessarily must sacrifice the interests of some of its members, to a degree, for the greater good of all. Steele v. Louisville & Nashville R.R., 323 U.S. 192, 202, 65 S.Ct. 226, 89 L.Ed. 173 (1944).

■■ On the other hand, while our national labor policy accords unions great discretion in representing their members, "the Supreme Court did not invest the Union with a carte blanche." Griffin v. U.A.W., 469 F.2d 181, 183 (4th Cir. 1972). Thus the doctrine of the duty of fair representation emerges, requiring a union to deal fairly, rationally and honestly with its members. The broad discretion accorded union decision making is particularly appropriate where there are implicated conflicting seniority rights in plant-merger cases. Invariably, no matter what the decision, made from among a number of reasonable methods of mixing two or more groups of employees, there will be disgruntlement.

In point is Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), which enunciated the fair representation duty in a bargaining context (as compared to the grievance processing context of Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) ).

The Court said:

The bargaining representative, whoever it may be, is responsible to, and owes complete loyalty to, the interests of all whom it represents. . . . Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

\* \* \* \* \* \*

The National Labor Relations Act, as amended, gives a bargaining representative not only wide responsibility but authority to meet the responsibility. . . .

\* \* \* \* \* \*

. . . A failure to adopt these provisions might have resulted in more friction among employees represented by International than did their adoption. 345 U.S. at 338, 339, 342–343.

*See also* Waiters Union, Local 781 of Washington, D. C. v. The Hotel Association of Washington, D. C., 162 U.S.App. D.C. 265, 498 F.2d 998 (1974); Johnson v. General Drivers, Warehousemen and Helpers, Local Union No. 89, 488 F.2d 250 (6th Cir. 1973); Hubicki v. United Steel Workers of America and A.C.F. Industries, Inc., 484 F.2d 519 (3d Cir. 1973); Trotter v. Amalgamated Association of Street Electric Railway and Motor Coach Employees of America, Division 1303, 309 F.2d 584 (6th Cir. 1962).

Here the Local Union acted to protect the legitimate interests of its Clark members against dilution from Harrison transfers by what it reasonably feared was an excess number of transferees in relation to the work being transferred, not out of a sense of hostility toward any member of the Sakala group. Indeed, the fact that a union has not exercised good judgment, or even that it has acted negligently, is insufficient, in the absence of animus, to constitute unfair representation, Bazarte v. United Transportation Union, 429 F. 2d 868 (3d Cir. 1970); *and see,* Price v. Teamsters, 457 F.2d 605 (3d Cir. 1972); Bieski v. Eastern Automobile Forwarding Co., 396 F.2d 32 (3d Cir. 1968).

Nor is there any substantial evidence that the International Union breached its duty of fair representation to either the Masullo or Sakala group. When its highest appellate body concluded that the intermediate body had decided the matter erroneously, it reversed and remanded the matter for further negotiations. The International provided appeals as sought; and that these were rights of substance were proved by the results.

It must not be forgotten that the issue here is not who—or what group— had the most accurate count of the number of men properly transferable from Harrison with full seniority.

Defendant International and Local Unions and their representatives were motivated at all times by a desire to represent the interests of their constituents fairly and impartially, and there is no evidence of hostility toward any individual or group, or of wrongdoing of any kind in the conduct of the defendants. Throughout the discussions, negotiations and appeals, all of the parties relied solely upon their conflicting but sincerely held views as to the amount of work which had been transferred.

Each of the several agreements reached between the Corporation and International Union under Paragraph 96 of the underlying collective bargaining was an effort to reach an "equitable solution" in the face of conflicting claims; each was valid until modified by the succeeding and superceding one;

and there was no breach of contract in the negotiation and enforcement of any of them.

Defendant Unions are not shown to have engaged in bad faith bargaining, nor are they shown to have represented the plaintiffs or their other constituents unfairly or improperly in making or enforcing any of the agreements forming the subject matter of these consolidated actions.

Both groups have made reference to certain alleged internal procedural irregularities in the processing by the unions of their respective claims—from the time that the transfers were first negotiated in 1968 to the time when the issue was ultimately resolved in 1972. Significantly, there is no evidence that any alleged procedural irregularity was the product of arbitrary, capricious, or bad-faith conduct on the part of International or Local Unions.

> [T]here is no requirement of formal procedures. The fiduciary principle precludes arbitrary conduct, but it must not be stretched so as to 'judicialize' the conduct of the affairs of the Union and cut athwart a common sense and practical approach toward resolution of problems and disputes that is fair in its essence without being rigid in its procedures. (citation omitted) Bures v. Houston Symphony Society, 503 F.2d 842, 843 (5th Cir. 1974).

As has been noted, there is no issue more difficult for a union to resolve to the satisfaction of all its members than that of work seniority following a merger of operations. The National Agreement in paragraph 96 recognizes that the best that can be achieved in such a situation is an "equitable solution", to be reached through the bargaining process between the Corporation and the International.

Here there is no substantial evidence that the International acted with hostility or in bad faith toward either group of plaintiffs. Under paragraph 96 it had a continuing duty to bargain in good faith in order to resolve the conflicting claims. Each of the several agreements reached between the International and the Corporation resulted from good faith collective bargaining. Each agreement stood until modified by the next one, and the International is not shown to have failed to have enforced compliance therewith by the Corporation.

The International's good faith is further reflected by its having fulfilled the obligation under its constitution to provide internal appeals, the last of which resulted in the Sakala group being vindicated.

The only redress the Sakala group now seeks is back pay for the period its members were deprived of their seniority with the consequences which flowed therefrom. Yet this too was a result of collective bargaining, with the Corporation's position being that, since it had from the beginning contended work for 34 jobs was transferred, it had a right to insist that it not be liable for back pay if it now agreed to the International's position. It cannot be successfully contended that the International violated its duty by agreeing to accept the Corporation's position. The International's motions are thus granted as to the Sakala plaintiffs.

Nor does the Masullo group fare better in its claim founded upon the International's handling of its responsibility under paragraph 96 in arriving at an "equitable solution" to the controversy between the two conflicting positions.

Even after initially accepting the 34 number, the International not only considered but granted the Masullo group's request that the matter be reconsidered; and, upon reconsideration, through the collective bargaining process, the International got the Corporation to agree to a reduction, 24, as a compromise. On the other hand, as the Masullo group knew, this was not necessarily the end of the matter. Under the constitution the Sakala group had the right of internal appeal; and here that appeal was suc-

cessfully undertaken. Presumably because the Masullo plaintiffs recognize that this court, in the context of this case, cannot reverse the Convention Appeals Committee's decision, they endeavor to challenge the procedure, claiming a deprivation of their right fairly to present their case. As I have earlier found, there was no such deprivation. In all respects, I find no basis for the Masullo claims against the International and the latter's motions against these plaintiffs are granted.

Turning now to the claims against the Local, the Masullo group has no basis for complaint against it. The Local, in fact, actively challenged the 34 figure from the beginning and presented its arguments to the International in connection therewith; and, of course, it was the International, not the Local, which had to resolve the seniority issues under paragraph 96. Thus the Local's motions against the Masullo group are granted.

The Local's motions against the Sakala group are also granted. While it is true that the Local challenged the 34 figure, it does not appear it did so in bad faith, but rather only because its leadership sincerely believed that the figure was inaccurate. Given this conviction, the Local had the right, if not the obligation, to advance its position to the International. Moreover, the determination that it was inaccurate, and the revision to 24 after collective bargaining with the Corporation, was made by the International, not the Local.

The foregoing constitutes my Findings of Fact and Conclusions of Law under F.R.Civ.P. 52.

An appropriate form of judgment should be submitted.[3]

---

3. I have not dealt specifically with each and every claim of alleged discrimination asserted by the plaintiffs. *See* 9–10 *supra*. For purposes of appellate review, however, I note that each such claim has been examined as to its accuracy, its materiality and in terms of whether each indicated or constituted discriminatory treatment. No such claim survived this three-tier analysis. Additionally, as to the Convention Appeals Committee's 1971 decision, and the earlier decision of the Union which led to the December 1969 agreement granting seniority to 24 men, it is not significant that one or both may be wrong. I do find that both positions were reasonable and reflected neither hostility nor animus to either of the plaintiff groups. I also find that the International acted, in the face of the Corporation's setting the initial number at 34, no differently than it had before in a paragraph 96 situation. No hostility or animus was evident in its conduct. Finally, the Masullo plaintiffs' interests were properly served at the Convention Appeals Committee hearing. T 281; PS–8, p. 83; Jt.Ex. 10, p. 12; T 282, 285, 294–298.